UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY



| | |
|---|---|
| In Re:<br><br>NORVERGENCE, INC.<br><br>Debtor. | Case No.: 04-32079 (RG)<br><br>Chapter 7 |
| CHARLES M. FORMAN, CHAPTER 7 TRUSTEE OF THE ESTATE OF NORVERGENCE, INC.,<br><br>Plaintiff,<br>vs.<br><br>THOMAS N. SALZANO, et al,<br><br>Defendants. | Adv. Pro. No.:   06-2142(RG)<br><br>OPINION |

**APPEARANCES:**

PORZIO, BROMBERG & NEWMAN, P.C.
BY: WARREN J. MARTIN, JR., ESQ.
     DOUGLAS A. AMEDEO, ESQ.
     ROBERT M. SCHECHTER, ESQ.
100 Southgate Parkway
P.O. Box 1997
Morristown, New Jersey 07962
*Special Litigation Counsel to Charles M. Forman, Chapter 7 Trustee*
  *of the Estate of Norvergence, Inc.*

PLATZER, SWERGOLD, KARLIN, LEVINE,
     GOLDBERG & JASLOW, LLP
BY: LINDA MANDEL GATES, ESQ.
1065 Avenue of the Americas, 18th Floor
New York, New York 10018
*Co-counsel for IFC Credit Corporation*

1

ASKOUNIS & BORST, P.C.
BY: VINCENT T. BORST, ESQ.
180 North Stetson Avenue - Suite 3400
Chicago, Illinois 60601
**Co-Counsel for IFC Credit Corp.**

FREY, PETRAKIS, DEEB, BLUM & BRIGGS, P.C.
BY: INEZ M. MARKOVICH, ESQ.
    LOUISE MELCHOR, ESQ.
10 Melrose Avenue, Suite 430
Cherry Hill, New Jersey 08003
**Attorney(s) for Alfa Financial Corp. d/b/a OFC Capital, Dolphin Capital Corp., Liberty
Bank, Sterling National Bank, PFG Commercial Finance, Commercial Finance and
Information Leasing Corp. n/k/a National City Commercial Capital**

BLANK ROME, LLP
BY: THOMAS E. BIRON, ESQ.
    GREGORY T. KUPNIEWSKI, ESQ.
One Logan Square
130 North 18th Street
Philadelphia, Pennsylvania 19103
**Attorney(s) for Popular Leasing U.S.A. Inc.**

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.
BY: JEFFREY P. RESNICK, ESQ.
4300 Haddonfield Road, Suite 311
Fairway Corporate Center
Pennsauken, New Jersey 08109
**Attorney(s) for First Lease, Inc.**

DUANE MORRIS LLP
BY: DAVID H. STEIN, ESQ.
744 Broad Street, Suite 1200
Newark, New Jersey 07012
**Attorney(s) for Insight Financial Corporation**

DRINKER, BIDDLE & REATH LLP
BY: A. DENNIS TERRELL, ESQ.
500 Campus Drive
Florham Park, New Jersey 07932
**Attorney(s) for U.S. Express Leasing, Inc.**

2

FARR, BURKE, GAMBOCORTA & WRIGHT, P.C.
BY: WILLIAM G. WRIGHT, ESQ.
1000 Atrium Way, Suite 401
P.O. Box 669
Mount Laurel, NJ 08054
*Attorney(s) for CitiCapital Technology Finance, Inc.*

## Rosemary Gambardella, Bankruptcy Judge

### MATTERS BEFORE THE COURT

In the adversary proceeding, designated as Adv. Pro. No. 06-2142 and initiated under the umbrella of the NorVergence Inc. Chapter 7 bankruptcy, a group of Defendants - CitiCapital Technology Finance, Inc. ("CitiCapital"), IFC Credit Corporation ("IFC"), FirstLease, Inc. ("First Lease"), Insight Financial Corporation, Inc. ("Insight"), Alfa Financial Corporation and related companies[1] (the "Alfa Group") and Popular Leasing USA, Inc. ("Popular") (collectively referred herein as "Leasing Companies")[2]- have each filed motions to dismiss the Complaint (also abbreviated as "Compl." or "Adv. Compl.") filed by Charles M. Forman, the Chapter 7 Trustee for the Estate of Debtor NorVergence, Inc. ("Debtor" or "NorVergence"). The leasing

---

[1] The "Alfa Financial Group" consists of Alfa Financial Corporation, d/b/a OFC Capital, Dolphin Capital Corporation, Information Leasing Corporation, n/k/a National City Commercial Capital, Liberty Bank, PFG Commercial Finance and Sterling National Bank. All of these interrelated entities are listed as defendants in the adversary proceeding. For the sake of convenience and efficiency, the Court will refer to these companies as "Alfa Group". By way of a letter, dated August 21, 2008, the Trustee provided the Court with an update of this adversary proceeding. As of that date, "this matter has also been settled with respect to PFG Commercial Finance pursuant to the Compromise and Settlement between the Trustee and National City Commercial Capital Company, LLC, successor-by-merger to National City Commercial Capital Corporation f/k/a Information Leasing Corporation f/k/a PFG Commercial Finance." By order dated November 26, 2007, the Court approved this settlement. See Docket Rep., # 236.

[2] As will be addressed in detail, upon Debtor's execution of contracts with its customers for the sale/lease of telecommunication equipment and services Debtor immediately assigned or resold these contracts to the leasing companies in exchange for a prompt cash payment.

3

companies invoke Fed. R. Civ. P. 8, 9, and 12(b)(6) as grounds for the relief sought. In addition, the movants also pursue the dismissal of the complaint as the courts in New Jersey have not recognized the tort of deepening insolvency. Even if the leasing companies have engaged in the wrongdoing alleged by the Trustee, the doctrine of in pari delicto provides them with an affirmative defense to the adversary proceeding. Defendant Popular, apart from requesting a dismissal of the complaint outright, requests that the Court order the Trustee to provide a more definite statement pursuant to Fed. R. Civ. P. 12(e) as an alternative remedy for the alleged vagueness of the Trustee's Complaint. The motion of Defendant Insight also seeks to dismiss the Cross-Claim for Indemnification and Contribution of Defendant Arthur S. Scuttaro.

The Trustee has submitted an omnibus brief ("Trustee's Omn. Repl.") in opposition the leasing companies' motions. Subsequent to the Trustee's response, the Leasing Companies filed separate replies to the Trustee's brief. Thereafter, the Trustee filed an omnibus sur-reply ("Trustee Sur Repl.") to these filings by the leasing companies.[3] Subsequent pleadings have also been filed by the parties herein.

Presently before the Court is also a motion to dismiss the Trustee's complaint and to join the other moving Defendants' motions, filed by US Express Leasing, Inc. ("USXL"). Like the other motions, USXL principally relies on Fed. R. Civ. P. 8, 9, 12(b)(6), 12(e) as well as the in pari delicto doctrine to support dismissal of the Complaint. This particular motion is separately opposed by the Trustee.

A third matter before the Court is IFC's motion for leave to file supplemental legal authority in support of its motion to dismiss the Trustee's Complaint. By way of this motion, IFC seeks to draw the Court's attention to the then recent opinion issued by the U.S. Supreme Court in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007), as it relates to an interpretation of Fed. R. Civ. P. 8(b).

---

[3] On March 22, 2007, IFC initiated a motion, joined by Insight on or about March 27, 2007, to strike the Trustee's omnibus sur-reply due to the Trustee's failure to obtain leave of Court to file his sur-reply as required by the Local Civil Rules of the United States Bankruptcy Court for the District of New Jersey, Rule 1001-1. See Docket Rep. # 184, #191. By order, dated July 30, 2007, this Court denied the petition striking the Trustee's sur-reply. See id., #221.

4

A hearing on these motions was conducted on June 14, 2007 at which time this Court reserved decision. After considering the parties submissions and oral arguments, the Court denies the motions to dismiss the Adversary Complaint, but will direct the Trustee to amend the complaint. Case law interpreting Rule 12(b)(6), including Twombly, counsels against the dismissal and mandates the Court, based on R.12(e), to order the Trustee to provide a more precise and definite statement. Regarding deepening insolvency, a review of recent Third Circuit case law leads to the conclusion that deepening insolvency is a viable, independent legal theory in New Jersey and an evaluation of whether the in pari delicto doctrine can be invoked by the Defendants as an affirmative defense requires a finding of facts unsuitable within the context of the current motions and must be reserved for summary judgment practice or trial.

The Court grants IFC's motion for leave to file supplemental legal authority. In light of Twombly, it is self-evident that a proper application of Rule 8 must be guided by that case. Thus, IFC's motion must be granted. Insight's Motion to Dismiss the Cross-Claim of Defendant Arthur S. Scuttaro for Indemnification and Contribution is also granted. The following constitutes this Court's findings of fact and conclusions of law.

## PROCEDURAL HISTORY AND STATEMENT OF FACTS

### A. Norvergence Bankruptcy

On June 30, 2004, ("the Petition Date"), Defendants Popular, OFC Capital, a division of Alfa Financial Corp., and Partners Equity Capital Company, LLC. filed an involuntary Chapter 11 bankruptcy petition against NorVergence under the United States Bankruptcy Code ("the Bankruptcy Code"). At a hearing held on July 14, 2004, the Debtor consented to the entry of an order for relief under Chapter 11 and for the immediate conversion of the case to a Chapter 7 liquidation proceeding. The Office of the United States Trustee appointed Charles M. Forman to serve as Trustee for Debtor's Chapter 7 Estate on that same date.

### B. The Instant Adversary Proceeding and Complaint

Two years after his appointment, on July 14, 2006, the Trustee commenced the instant

5

Adversary Proceeding[4] in Debtor's bankruptcy case against forty-two (42) defendants, including eight (8) individuals and/or corporate insiders- Thomas N. Salzano ("TNS"), Debtor's managing consultant, and Peter Salzano[5], Debtor's CEO and major shareholder as well as brother of TNS, Alexander Wolf, Robert Fine, Robert Wizeman, William Jean Charles, Terry Skemer and Arthur Scutarro[6]- and thirty four (34) leasing companies, among them Citi Capital., IFC., FirstLease., Insight, Alfa Group, Popular and USXL. See Compl., pp.3-4. The Adversary Complaint asserts a total of twelve Counts, Counts four, five, six, seven and eight[7] concern Debtor's principals and other individuals while the remaining Counts target the Leasing Companies as well as the corporate insiders.[8]  Since the first, second, third, ninth, tenth, eleventh and twelfth counts are the subject of the pending motions, the Court will limit its discussion accordingly.[9]

---

[4]Apart from filing the instant adversary proceeding, Docket No. 06-2142, the Trustee also commenced another separate adversary case, under Docket No. 06-1403, listing Thomas John Salzano, the son of Debtor's former Managing Consultant, Thomas N. Salzano, as Defendant..

[5]According to the Trustee, Peter Salzano is listed as a defendant merely for notice purposes. The Trustee is not moving forward with legal action against Peter Salzano due to the latter's own Chapter 11 bankruptcy in this Court (Case No. 05-11415). See Compl., at 8, ¶9.

[6]Messrs. Wolf, Fine, Wizeman, Charles, Skemer and Scuttaro were all officers and/or directors and/or employees with significant management responsibilities.

[7]The Complaint's Count Four involves Fraudulent Transfer under 11 U.S.C. §§548 and 550 as against Thomas N. Salzano and William Jean Charles ("Charles"). Count five asserts a Fraudulent Transfer under 11 U.S.C. §§ 544(b), 550 and N.J.S.A. 25:2 et seq. as against TNS, Charles and the other insiders. The sixth Count also advances a Fraudulent Transfer based on 11 U.S.C. §§ 544(b), 550 and N.J.S.A. 25:2-27(b) against TNS, Charles and the other insiders. Count seven alleges Conversion and Misappropriation on the part of TNS and Charles while the Complaint's eighth Count presents an Unjust Enrichment claim against TNS, Charles and other corporate insiders.

[8]With respect to these counts, the Court notes that the Complaint as submitted are misnumbered as there are two counts identified as the Tenth Count. The Trustee has since clarified that "[t]he last three Counts were inadvertently labeled 'Tenth Count, Tenth Count and Eleventh Count." See Trustee's Omnibus Reply at 1, n. 3. For the purposes of clarity, the Court will regard the last three counts as the Tenth, Eleventh and Twelfth Counts.

[9]On June 29, 2007, an Order was entered by this Court dismissing with prejudice Counts one, two and three of the Complaint as against USXL. See Docket Rep. #210. As a result,

With regard to the named Leasing Company Defendants, the Complaint alleges the following counts:

| First Count: | "Actual Intent Fraudulent Conveyance Under 11 U.S.C. § 548 As Against Leasing Companies" |
| Second Count: | "Actual Intent Fraudulent Conveyance Under 11 U.S.C. § 544 And Under N.J.S.A. 25:2-25 As Against Leasing Companies" |
| Third Count: | "Recovery Pursuant To 11 U.S.C. § 553(b) Of Certain Amounts Setoff By Leasing Companies Within The 90 Days Before The Petition Date" |
| Ninth Count: | "Accounting And Turnover Under 11 U.S.C. § 542 As Against Salzano, William Jean Charles As Well As The Insiders And The Leasing Companies" |
| Tenth Count: | "Breach Of Fiduciary Duty Against Salzano, Alexander Wolf, Robert Fine, Bob Wizeman, William Jean Charles, Terry Skemer and Arthur Scuttaro and Aiding And Abetting A Breach Of Fiduciary Duty Against Leasing Companies" |

---

USXL's motion will only be addressed in terms of Counts Nine, Ten, Eleven and Twelve. The Court will do so simultaneously with the arguments set forth by the other moving Defendants with respect to each count.

Tenth Count[10] :     "Fraud Against Salzano, Alexander Wolf, Robert Fine, Robert Wizeman, William Jean Charles, Terry Skemer and Arthur Scuttaro and Aiding And Abetting A Fraud Against Defendant Leasing Companies"

Eleventh Count[11] :     "Deepening Insolvency As Against All Defendants."

### C. Norvergence's Pre-Petition Business Operations

The Trustee asserts here as follows. Debtor NorVergence was incorporated in September, 2001, by Peter Salzano, as President, CEO and major shareholder. From the start of the company through the days leading up the bankruptcy, Peter's brother, TNS, officially retained by Debtor as a consultant, assumed a managerial position with Debtor, virtually controlling all of Debtor's affairs. Some time in 2002, NorVergence commenced operations as a seller and reseller of certain telecommunications equipment and services "to small businesses, church organizations and not-for-profits, typically with a small number of employees,"a clientele often without access to telecommunications or information technology staff and in-house legal counsel. Trustee Compl. ¶48.

### 1) NorVergence's Products

The Trustee further asserts that NorVergence promised substantial savings to its customers on local, long distance, and cell phone usage, as well as internet access. Debtor's core product was a device known as the Matrix Box, designed and manufactured by AdTran, Inc. NorVergence purchased these boxes for $1,278.00 from the manufacturer. Customers were informed this "high tech device" would eliminate per minute charges on calls, even though it did not. "Rather, the Martrix Box was simply an AdTran router and software which enabled the voice and data to be

---

[10]As noted earlier, this Count, which the Court will address as Count eleven, is also labeled as the Tenth Count in the Complaint. Some leasing company defendants have referred to this count as 10².

[11]This claim is labeled as the Twelfth Count in this opinion.

transmitted over a line." Id., ¶57. Despite the use of the box, "that line still required an ultimate wholesale carrier and NorVergence was still required to reimburse that carrier for per minute charges. Id.

### 2) NorVergence's Sales Process

The Trustee asserts here that the Debtor's sales process involved calling centers where the sales force approached potential customers. The company's salespeople consisted out of so-called Inside Sales Representatives ("ISR") and Outside Screening Managers ("OSM") (collectively the "NorVergence sales force"). During sales calls, Debtor's IRS followed formulaic scripts that extolled the virtues of the products and services offered and induced potential customers to acquire the "NorVergence package, primarily the Matrix Box". Id., ¶53. Essentially, the IRS' purpose was to arrange for the customer to meet with one of Debtor's OSM. The OSM met the customer to obtained information about his or her existing phone system. Based on this information, the OSM crafted a proposal titled the "NorVergence Solution." This solution, it is alleged, invariably meant Debtor simply applied a 20-30% discount to the potential customer's current cost for telecommunication services. NorVergence selected this discount without any regard for the actual cost to provide these services or Matrix Box, a box supplied for free to the consumer by other phone service providers. Upon reducing the potential client's current telecommunication costs by the discount, Debtor proceeded by setting forth the promised savings in a "Cost Savings Proposal" and were presented to the client in the form of fixed monthly cost for an integrated service package, a package including the telecommunication services and the rental fee for the Matrix Box. See id., ¶¶ 62-63.

Despite the discount rate Debtor utilized to craft its proposal, the NorVergence solution was by and large premised upon the lease of the Matrix Box. Frequently, Debtor's solution amounted to a lowering of the potential customer's telecommunication costs while at the same time proposing to the non-suspecting customer to pay between $10,000 up to $160,000 in some instances over the five year life of the contract for a $1,278 item Debtor purchased from AdTran. See id., ¶94.

### 3)Matrix Leases

Once Debtor's sales force successfully solicited a customer, the client entered into two separate agreements (the "Matrix Leases") with NorVergence in connection with the purchase of

telecommunications services. One agreement governed the provision of services, the "Norvergence Service Contract" or "Service Contract". The other contract concerned an Equipment Rental Agreement ("ERA"), pursuant to which the customer leased the Matrix Box that purportedly facilitated the provision of discounted telecommunications services by Debtor. Id., ¶64. The contracts required customers to lock themselves in for a five year term even though NorVergence had no long term agreements with carriers to support a five year commitment. Id., ¶59. Contrary to what the NorVergence sales people told prospective customers, if Norvergence ceased its business operations or discontinued reimbursing its carriers for per minute charges, all customer service would end. Id., ¶58.

Of potential consequence to the pending litigation in this adversary proceeding are some of the contractual provisions in the Matrix Leases. The Trustee alleges here that the contracts contained a choice of law and forum provision, requiring the customer to possibly litigate in a distant forum should legal action ensue and in other cases in a forum where the Leasing Company that would take an assignment was located, unknown at the time the customer signed the contract ("floating jurisdiction clause"), and a "hell or high water" clause, forcing customer to continue to make lease payments even when equipment failures, damage, loss or other problems such as service interruptions occurred. See id., ¶ 78; Ex. B. at 6. In addition, the contracts also contained a representation indicating the document would be considered a finance lease under the Uniform Commercial Code ("U.C.C."), Article 2A. They also required the consumer to dispense with certain product warranties and contained a waiver of defense clause whereby a client agreed to waive any legal defenses against an Assignee of the contract it could assert against Debtor. See id.

The Complaint provides one illustration of a "typical transaction" with a customer, Investment Management Associates, an affiliate of Darakjian Jewelers, Inc. ("Darakjian"). A partial set of documents seek to evidence that during a NorVergence OSM meeting with Darakjian, the prospective customer had been paying $1,789.14 per month for its internet and telephone service. See id., Ex. B. After the OSM-client meeting, NorVergence generated a solution and applied an approximate discount of 20%[12] to Darakjian's monthly telecommunication costs to arrive at a

---

[12] In Darakjian's case, the discount amounted to 20.28%. See Compl., ¶ 67.

monthly payment of $1,426.30 for the same telecommunication services, the NorVergence Solution. Id., ¶67. The OSM generally allocated a certain portion of the proposed monthly payment to the Lease of the Matrix Box (80%) and to the NorVergence Service Contract (20%).[13] Id., ¶68. Based on these numbers, Darakjian executed a five year NorVergence Service Contract for unlimited voice and internet for $196.95 per month and a five year Matrix Box Lease at $1,229.35 per month. Id., ¶69.[14]

### 4) Sale of Matrix Leases to Leasing Companies

Apart from the sale/ resale of telecommunications services and the AdTran Matrix Box, the marketing efforts relying on the use of carefully worded scripts emphasizing the benefits of the NorVergence Package, the use of a Cost Savings Proposal as well as encouraging new customers to execute the Matrix Leases, Debtor's business model also included the immediate assignment of the customer leases to a number of leasing companies. Debtor entered into a Master Program Agreement ("MPA") with these entities pursuant to which NorVergence sold or assigned a majority of the Matrix Leases to the leasing companies. The leasing companies, in turn, utilized a "Lease

---

[13] In the Darakjian example, the exact allocation came to 86.2% of the $1,426.30, amounting to a $1,229.35 lease payment for the Matrix Box with 13.8% ($196.95) attached to the telecommunication services component of the NorVergence Package, the NorVergence service contract.

[14] The Leasing Companies supplied a "lease rate" to determine how much to pay to NorVergence for the five year customer leases. Using a common lease rate of .02187, Debtor would have received $46,213.00 in cash from the Leasing Company as consideration for signing up Darakjian. See Compl., ¶¶71-78.

Rate" to determine how much to pay NorVergence for the leases.[15] The cash proceeds received from the leasing entities, according to the Trustee, were "recognized by NorVergence, improperly, as immediate revenue and consumed in operations. Those operations were geared almost entirely towards obtaining new customers." Id., ¶75.

As far as the MPA is concerned, it set forth the terms under which the leasing companies would acquire the leases from NorVergence and pay Debtor cash consideration in return. Section 1 of the MPA, executed between Debtor and Popular Leasing, entitled "Credit Procedures", provides in relevant part:

> NorVergence acknowledges that Popular shall not conduct a Customer interview during the credit approval process, which is contrary to Popular's standard credit policy.

Id., Ex. C, "Master Program Agreement," ¶1.   Section 2,"Assignment Of Rental Agreements, provides in relevant part that:

> [i]n the event of any Customer defaults in the payment of the first rental where an actual payment of money is due, and such default is not cured within 30 days, then NorVergence shall repurchase said defaulted Assigned Rental Agreement from Popular for the dollar amount originally advanced by Popular plus interest on the funds advanced at a rate equal to the then current Prime Rate ... plus 200 Basis Points.

Id., Ex.C, ¶2. The Trustee asserts that these MPA provisions were typical of NorVergence's MPA's with other leasing companies.

In sum, under its business model as it existed between 2001 and 2004, Debtor constantly attempted to recruit as many customers as possible for the NorVergence telecommunication package and offered to provide telecommunication services at a loss while collecting a profit on the lease of the Martix Box. Once a customer executed the Matrix Leases, NorVergence quickly generated cash

---

[15] See n.14.

by transferring the leases to the leasing companies, "immediately monetizing the leases and churning the flow of new customers." Id., ¶76.

According to the Trustee, the cash proceeds generated by the monetization of the Matrix Leases were insufficient to fund NorVergence's business operations. At the peak of business, Debtor's total revenue amounted to approximately $2.5 million each month. See id., ¶80. On the expense side, Debtor's massive call center and OSM work force( approximately 1,600 employees) resulted in a payroll of approximately $10 million per month. Total monthly expenses approached $18 to $19 million. See id., ¶81. The Trustee asserts that the sale of leases enabled NorVergence to collect $3 to $4 million per week to offset the large operational costs. The NorVergence business model did not create cash reserves to expand business. "All of the customer revenue that should have been spent over a 60 month period preserving and servicing the customers was monetized in the sale of leases, spend immediately on more call center payroll to acquire new customers, and devoted to provide perks for Salzano and the insiders." Id., ¶ 83.

After less than two years of implementing its business plan, new customers were not added quickly enough to maintain the company. As a result, due to financial distress, Debtor failed to pay its carriers and suppliers, triggering the filing of the involuntary bankruptcy. The day after NorVergence's bankruptcy, on July 15, 2004, the telecommunication service to its customers came to an end. See id., ¶85.

Inadequate funding of Debtor's operations, coupled with the vast expansion of its clientele, set the stage for the NorVergence bankruptcy as the company began to experience significant difficulties with providing customers the Matrix box on a timely basis or to get the customer's phone line activated in time to avoid "first payment defaults." "Beginning in October of 2003 continuing through early 2004, the number of First Payment Defaults continued to increase dramatically." Id., ¶108. As a result, some of the leasing companies began to hold back as much as 25% to 50% of the amount due to NorVergence under the MPA on each lease as a hedge against future First Payment Defaults. Id. In withholding a certain portion of the funds due to Debtor, some of the leasing entities engaged in offsets, offsets that are the subject of the Trustee's Complaint. At the same time, Debtor re-purchased the leases of defaulting customers, in accordance to the MPA's Lease Repurchase Obligation provision. According to the Trustee, NorVergence made the following known payments

13

to the Leasing Companies and Movants:[16]

|  | Check Payments | Offsets |
|---|---|---|
| 1) CitiCapital | $ 62,040.06[17] | |
| 2) First Lease | $ 68,018.40 | |
| 3) Insight | $521,077.16 | |
| 3) IFC | $ 50,737.53 | $708,244.86 |
| 4) Alfa/OFC | $224,696.77 | $168,489.82 |
| 5) Dolphin Capital Corp. | $100,521.63 | |
| 6) Information Leasing Corp. n/k/a | | |
|     National City Commercial Capital | $253,648.16 | $ 9,920.85 |
| 7) Liberty Bank | $ 66,539.69 | $ 57,962.18 |
| 8) PFG Commercial Finance | $ 25,673.08 | $ 32,775.94 |
| 9) Sterling National Bank | $143,064.30 | $ 109,173.80 |
| 10) Popular Leasing | $486,474.78 | $4,936,008.57 |

These transfers of funds between Debtor and the Leasing Companies with respect to NorVergence's defaulting clients contributed to the financial distress. Together with the setoffs, they also form a basis for the Trustee's Adversary Complaint against the Leasing Companies.

---

[16]The Complaint also lists other Leasing Companies which received funds from Debtor based on an MPA's lease repurchase clause. Together with the funds paid to Movants, Debtor expended a total of approximately $6,623,660.60 to reacquire equipment leases from customers defaulting on their lease payments. See Complaint at ¶112.

[17]The amounts of payments and offsets displayed here for some of the Defendants are different from those found in the Trustee's Complaint. The Trustee's Omn. Resp., at 2, contains updated numbers which have been incorporated above to reflect the most recent information available to the Trustee.

After the Trustee commenced the instant Adversary Proceeding on July 14, 2006 by filing the Complaint, Defendant CitiCapital filed a motion requesting the dismissal of Counts One, Two, Three, Ten, Eleven and Twelve. thereof pursuant to Fed. R. Civ. P. 12(b)(6) made applicable to this proceeding by Fed. R. Bankr. P. 7012. Defendant IFC, on November 3, 2006, filed a Motion to Dismiss Counts One, Two, Three, Nine, Ten, Eleven and Twelve of the Complaint relying on Fed. R. Civ. P. 9 made applicable to this proceeding by Fed. R. Bankr. P. 7009 as well as Rule 12(b) 6. On November 6, 2006, First Lease joined in Citi Capital and IFC's motions. On December 15, 2006, Insight18 filed a motion seeking the dismissal of the Complaint which has plead Insight as an alias for Defendant IFC Financial, which Insight asserts is incorrect. According to Insight, the Complaint also fails to present specific allegations against it that would give rise to a claim and must be dismissed. Lastly, that the Complaint involving Insight was improperly served in violation of Fed. Bankr. R. 7004(b) 3, an additional ground warranting the dismissal of the Complaint under Fed. R. Civ. P. 12(b)(4) and/or (5). Defendants Alfa Group and Popular each filed motions to dismiss the aforesaid Counts for in large part the reasons as advanced by Citi Capital and IFC. On January 24, 2007, the Trustee's Omnibus Brief in Opposition sought to address the various issued raised by the Defendants and asserted that the applicable Rules of Civil Procedure were adequately followed. It also discussed the viability of the Deepening Insolvency tort under New Jersey law. On February 12, 2007, Insight's Reply reiterated the arguments favoring the dismissal of Counts one, two, three, ten, eleven and twelve. Defendants Alfa Group and Popular also filed replies, reasserting grounds for dismissal of Counts One, Two, Three, Nine, Ten, Eleven and Twelve. Popular also requested a more definite statement based on Fed. R. Civ. P. 12 (e). Finally, Citi Capital and IFC also filed their respective replies to the Trustee's Omnibus Brief once again reasserting their grounds for dismissal of the Counts in question.

On March 20, 2007, the Trustee's Sur-Reply restated the position that the Complaint comports with the necessary pleading rules. The Trustee also contends the Defendants' use of the In Pari Delicto defense is inappropriate and, if applicable, premature at the pleading stage. As far as the

---

18 Defendant Insight's Motion to Dismiss also petitioned the Court for a dismissal of a Cross-Claim pursued by Arthur S. Scuttaro, a former officer of Debtor. The Cross-Claim, filed against Debtor and all of the other Defendants named in the Complaint on September 8, 2006, sought indemnification and contribution. On November 6, 2006, the

service of the Complaint upon Defendant Insight is concerned, the Trustee asserts that proper service was effectuated. The Trustee also requests permission to amend the Complaint to provide more information detailing Insight's alleged involvement in the Debtor's business.

On April 16, 2007, Defendant USXL filed a Motion to Dismiss the Complaint and joinder to the motions filed by the other Defendants and pointed to the Trustee's failure to allege specific transactions between USXL and Debtor, specifically that NorVergence did not repurchase any of the Rental Agreements from USXL nor did USXL receive setoff for Rental Agreements that defaulted as alleged in paragraph 112 of the Complaint and in the avoidance Counts.[19] The Trustee responded with a Brief in Opposition, noting the Complaint expressly states that as to the recipients of ROF payments, that the list is incomplete and limited to recipients of 'known' payments. Trustee's Compl. at ¶112. Various post-hearing submissions have also been received and considered in the disposition of this matter.

## DISCUSSION

I) Standard of Review
   A. Rule 12 (b)(6) Motion to Dismiss

The movants seek the dismissal of the Trustee's Complaint based on Fed. R. Civ. P. 12(b)(6), Fed. R. Civ. P. 9(b) and Fed. R. Civ. P. 8. Pursuant to Fed. R. Civ. P. 12(b)(6), made applicable to this proceeding by Fed. R. Bankr. P. 7012(b), a party may move to dismiss a complaint for failure to state a claim upon which relief may be granted. A motion presented under Rule 12(b)(6) "serves to test the sufficiency of the factual allegations in the plaintiff's complaint." In re DVI, Inc., 2008 Bankr. LEXIS 2338 at *5; (D. Del. 2008). (citing Kost v. Kozakiewicz, 1. F.3d 176, 183 (3d Cir. 1993)). It is also designed "to eliminate actions that are fatally flawed in their legal premises and destined to fail, and thus spare the litigants the burdens of unnecessary pretrial and trial activity."

---

Court, in response to various motions to dismiss the Cross-Claim entered orders granting the relief as to those specific Defendants. See Docket Rep., # 113, 114, and 115. See Footnote 28 infra.

   [19] See n 9.

Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., 988 F.2d 1157, 1160 (Fed. Cir. 1993),
(citing Neitzke v. Williams, 490 U.S. 319, 326-27, 104 L. Ed. 2d 388, 109 S. Ct. 1827 (1989), cert.
denied, Hess v. Advance Cardio Vascular Systems, Inc., 520 U.S. 1277; 117 S. Ct. 2459; 138 L. Ed.
2d 216 (1997).

For many decades, federal courts relied on Conley v. Gibson, 355 U.S. 41, 45-46 (1957), 78
S. Ct. 99, 2 L. Ed. 2d 80 (1957 for the proposition that under Rule 12 (b)(6) a complaint could only
be dismissed if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his
claim which would entitle him to relief." Apace Communications, LTD v. Burke, 522 F. Supp. 2d
512, 515 (W.D.N.Y. 2007). In Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1964-74, 167 L. Ed. 2d
929 (2007), the U.S. Supreme Court, confronted with a Rule 12(b) (6) motion to dismiss an antitrust
claim for failure to plead in accordance to Rule 8(a) (2), dispensed with Conley's "no set of facts"
language. Id. (citing Twombly, 127 S. Ct. at 1968-69). As a proper restatement of the Rule 12 (b)(6)
standard, the Twombly Court stated

> While a complaint attacked by a Rule 12(b)6 motion to dismiss does not need
> detailed factual allegations, a plaintiff's allegation to provide the 'grounds' of his
> entitlement to relief requires more than labels and conclusions, and a formulaic
> recitation of a cause of action's elements will not do. Factual allegations must be
> enough to raise a right to relief above the speculative level on the assumption that
> all of the complaint's allegations are true.

Twombly, 127 S.Ct. at 1959. There must be "plausible grounds to infer actionable conduct, i.e.
enough 'to raise a reasonable expectation that discovery will reveal evidence of [actionable
conduct]'." Apace Communications, LTD. v. Burke, et al., 522 F. Supp. 2d 51 at 5 (citing Twombly,
127 S.Ct. at 1974); Wilkerson v. New Media Technology Charter, 522 F.3d 315, 322 (3d Cir. 2008)).
"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to
offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L.
Ed. 2d 90 (1974); Maio v. Aetna, Inc., 221 F.3d 472, 482 (3d Cir. 2000).

The Third Circuit has interpreted Twombly as requiring that "[t]he allegations of the
complaint should 'plausibly suggest' the pleader is entitled to relief." Wilkerson, 522 F.3d 315, 321
(citing Twombly, 127 S.Ct. at 1966). "After Twombly, it is no longer sufficient to allege mere
elements of a cause of action; instead a complaint must allege facts suggestive of [the proscribed]

conduct." <u>Philips v. County of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008) (citing <u>Twombly</u>, 127 S. Ct. at 1969).

The landmark case of <u>Twombly</u> did not affect the well-settled standard that when considering a Rule 12 (b)(6) motion, a reviewing court "must accept all well-pleaded allegations in the complaint as true, and view them in the light most favorable to the plaintiff." <u>In re DVI, Inc.</u>, 2008 Bankr. LEXIS 2338 at * 6 (Bankr. D. Del. 2008) (citing <u>Carino v. Stefan</u>, 376 F.3d 156,159 (3d Cir. 2004); <u>Philips v. County of Allegheny</u>, 515 F. 3d at 231 ("The Supreme Court did not address the part about drawing reasonable inferences in favor of the plaintiff, but we do not read its decision to undermine that principle.")

### B) Rule 8(a) Motion to Dismiss

Fed. R. Civ. P. 8(a)(2), as incorporated into the Bankruptcy Code by Rule 7008(a) of the Fed. Rules of Bankr. P. states in relevant part that a pleading stating a claim for relief must also contain "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to provide "the defendant fair notice of what the ... claim is and the grounds upon which it rests." <u>Twombly</u>, 127 S. Ct. at 1964-65 (citing <u>Conley v. Gibson</u>, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). To comply with Rule 8 (a) 2's 'notice pleading requirements and to prevent a dismissal of a complaint based on Rule 12 (b)(6), "[a] plaintiff need not set out in detail the facts upon which he bases his claim, so long as he gives the defendant(s) fair notice of the claim" and the reasons giving rise to the claim to permit a defendant to answer and to prepare for trial. <u>In re Plassein Internat. Corp., et al.</u>, 352 B.R. 36, 42 (Bankr. D. Del. 2006) (citing <u>Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163, 167, 113 S. Ct. 1160, 122 L. Ed. 517 (1993).

### C) Rule 9(b) Motion to Dismiss

Dismissal of a complaint under Rule 12 (b) (6) can be based upon a plaintiff's failure to meet the heightened pleading requirements of Fed. R. Civ. P. 9(b), made applicable to bankruptcy proceedings pursuant to Fed. Bankr. R. P. 7009. According to Rule 9(b), a party alleging fraud "must state with particularity the circumstances constituting fraud .... Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The purpose of the heightened pleading requirement of Rule 9(b) "is to provide notice, not to test the factual

allegations of the claim." <u>Morganroth & Morganroth v. Norris, McLauglin & Marcus, P.C.,</u> 331 F.3d 406, 414 n.2 (3d Cir. 2003) (citing <u>Gutman v. Howard Savings Bank,</u> 748 F.Supp. 254, 257 (D.N.J. 1990)). Rule 9(b)'s demand for specificity exists to enable defendants to prepare a defense to the allegations. <u>See Rolo v. City Investing Co. Liquidating Trust,</u> 155 F.3d 644, 659 (3d Cir. 1998). It "requires plaintiffs to plead with particularity the circumstances of the alleged fraud to place the defendants on notice of the precise misconduct with which they are charged." <u>In re Inacom Corp., et al.,</u> 2001 Bankr. LEXIS 1297 at *10 (Bankr. D. Del. 2001). (citing <u>Seville Indus. Machin. v. Southmost Machin.,</u> 742 F.2d 786, 791 (3d Cir. 1984)), <u>cert. denied,</u> 469 U.S. 1211, 84 L. Ed. 2d 327, 105 S. Ct. 1179 (1985)).

Even though Rule 9 mandates the pleading of fraud claims with precision in corporate fraud cases, "courts have relaxed the rule when factual information is peculiarly within defendant's knowledge or control." <u>Craftmatic Sec. Litig. v. Kraftsow,</u> 890 F.2d 628, 645 (3d Cir. 1989). Generally, fraud allegations of date, place, and exact manner qualify for purposes of meeting the R. 9 standard. <u>Seville Machine Corp.,</u> 742 F.2d 786, 791 (3d Cir. 1984); <u>In re Rockefeller Ctr. Props. Secs. Litig.,</u> 311 F.3d 198, 217 (3d Cir. 2002) (who, what, when, where and how of events at issue may serve as adequate support for a fraud claim). A plaintiff is free, however, to utilize "alternative means of injecting precision and some measure of substantiation" into a fraud allegation. <u>In re Seville Machine Corp.,</u> 742 F.2d at 791. It is also customary in the context of bankruptcy to interpret Rule 9 liberally, particularly when the trustee, a third party outsider to the fraudulent transaction is bringing the action. <u>In re MacGregor Sporting Goods, Inc.,</u> 199 B.R. 502, 514-15 (Bankr. D.N.J. 1995 ; <u>In re O.P.M. Leasing Serv. Inc.,</u> 32 B.R. 199, 203 (Bankr. S.D.N.Y. 1983)).

With respect to pursuing a complaint against multiple defendants, Rule 9(b) permits the pleading of intent, knowledge and other conditions of a defendant's mind to be averred generally. Nevertheless, "[r]ule 9(b) does not allow a complaint to merely lump multiple defendants together but requires] plaintiffs to differentiate their allegations when suing more than one defendant ... and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." <u>Apace Communications, Ltd.,</u> 522 F. Supp. 2d 512, 517. (citing <u>Swartz v. KPMG, LLP.,</u> 476 F.3d 756, 764 (9th Cir. 2007)) (internal citation omitted); <u>see also Poling v. K. Hovanian Enterprises,</u> 99 F. Supp. 2d 502, 508 (D.N.J. 2000), appeal dismissed, 32 Fed. Appx. 32 (3d Cir. 2002).

19

("allegations that generally allege fraud gainst multiple defendants, without informing each defendant as to the specific fraudulent acts he or she is alleged to have committed do not satisfy Rule 9(b)").

II) Count I- Fraudulent Conveyance- 11 U.S.C. §548 & Count II-Fraudulent Transfer-U.S.C. §544.

The Trustee alleges that pursuant to the MPA's Debtor executed with the Leasing Agreements, Debtor needed to reimburse Defendants on Debtor customer's first payment defaults by repurchasing the leases from the Leasing Companies. See Complaint at ¶117. The funds used by Debtor to fulfill its repurchase obligations to the Leasing Companies were obtained almost exclusively from new customer's execution of leases and the sales of those leases to Defendants. Id. at ¶118. Had Debtor not honored the MPA's repurchase provisions, the Leasing Companies would have declared Debtor in breach of the contract and terminated the lease lines, thereby bringing Debtor's business to a halt. See id. Debtor's customers, upon the cessation of Debtor's business were left without contracted for telecommunication services, and as a result became creditors of Debtor. Id. at ¶120. According to the Trustee, Debtor made the lease repurchase obligation payments to cover the leasing companies on the customer defaults with the actual intent to hinder, delay or defraud creditors by perpetuating the so-called "Salzano Scheme". Id. at ¶121. These payments, it is alleged, "are fraudulent conveyances pursuant to 11 U.S.C. §548(a)(1)(A)" and they must be returned to the Trustee pursuant to 11 U.S.C. § 550(a) (Count One). The Trustee also asserts that such payments are fraudulent transfers pursuant to 11 U.S.C. § 544 and the New Jersey Uniform Fraudulent Transfer Act N.J.S.A. 25:2-25 and must be paid over to the Trustee pursuant to 11 U.S.C. § 550(a) (Count Two).

Defendant Citi Capital, in response to the Complaint's Count I, contends the Complaint's allegations fail to set forth the essential elements establishing the elements of a fraudulent conveyance. The Trustee merely recites statutory language and conclusions. Plaintiffs' failure to allege any particulars connecting the Defendant to the "fraudulent conveyances" reduces the Defendant to "guesswork and conjecture" in responding to the Complaint. Citi Capital Resp. at 8. IFC also objects to the sufficiency of the fraud counts and argues that the particularity standard under

Rule 9 (b) as it applies to pleadings of fraud is not met. The Trustee does not plead "the who, what, when, and where of the alleged fraud." IFC Resp. at 13. Additionally, the complaint lumps together over thirty defendants and does not distinguish the particular facts relevant to each individual Defendant's transactions with NorVergence. Id.

In support of their motions, Citi Capital and IFC raise similar arguments.[20] Defendant Insight also relies on Rule 9(b) and the lack of specificity of the Trustee's fraud allegations.[21] See Insight Brief at 10. Alfa Group presents similar arguments and also points to the Trustee's failure to identify how the repurchase payments defrauded creditors. The Complaint also fails to identify any badges of fraud relied upon to determine actual intent, as set forth by N.J.S.A. 25:2-26 with the possible exception of Debtor's insolvency when the transfers occurred. The complaint does not reveal the dates of transfers and the circumstances of the purported repurchase payments. In sum, Counts I and II are vague and lack the required specificity under Rule 9(b) and must be dismissed pursuant to Rule 12 (b)(6).

Popular[22] raises similar arguments regarding the sufficiency of the Complaint's Count I and II. These two counts, Popular urges, do not adequately plead intent to defraud on the part of Defendant Popular. There is nothing fraudulent about NorVergence meeting its contractual obligations to Popular and the facts alleged do not indicate "intentional fraud" but instead involve nothing more than a legal business transaction. As far as the badges of fraud, Popular shares the view of Insight that the facts do not support the existence of any such badges of fraud with the one

---

[20] Defendant IFC and Popular also contest the alleged improper use of a Texas state court decision, Specialty Optical d/b/a SOS v. IFC Credit Corp., Case No. 04-04187-C, involving IFC and the use of NorVergence's telephone scripts to recruit customers to acquire the telecommunication services and equipment. To the extent the Trustee and the Parties discuss the Texas case, Texas court rules do not make the case binding upon this court. Moreover the use of this case to suggest IFC's or any of the other Defendant's intent, Defendants not parties to that case, is questionable. Accordingly, the Court will not rely on the Case as part of this analysis.

[21] Insight also claims the Trustee has not stated a claim against the Defendant. That the Complaint mistakenly associates Insight with IFC Credit Corp., a separate and unrelated entity. Insight also requests the dismissal of the complaint due to the Trustee's improper service of process in violation of Bankr. R. 7004(b)(3), pursuant to Fed. R. Civ. P. 12(b)(4) and (5) and Fed. R. Bankr. P. 7012(b). These two grounds for dismissal will be addressed later in the Opinion.

[22] Defendant Popular also devotes time in its brief to the fairness of the Leases, i.e., the legality and enforceability of the forum selection clause and the "hell or high water clauses" and the Article 2A statement in the subject leases. The fairness of the Leases is not pertinent to whether the Trustee's pleadings comport with Fed. R. Civ. P. 8, 9 or 12 and therefore will not be part of the analysis.

possible exception of insolvency. See Popular Br. at 19. Assuming insolvency has been sufficiently alleged, the existence on a single badge of fraud is inadequate for a finding of actual fraudulent intent when Debtor fulfilled its contractual repurchase obligations to Popular and the other Leasing Companies. See id. According to the Trustee, Debtor intended to defraud creditors by merely complying with its contractual repurchase and first payment default obligations to Popular and the other leasing companies. See Compl. at 121. Popular asserts that merely satisfying a legal obligation cannot by itself form the basis of actual fraudulent intent. Rather, the Trustee must prove that NorVergence's payment of its contractual obligations to Popular were themselves made with actual intent to hinder, delay or defraud creditors. See In re Sharp Int'l Corp., 403 F.3d 43, 56 (2nd Cir. 2005). Here, it is argued, the Trustee cannot ground a fraudulent transfer claim based on actual intent against Popular solely on NorVergence's repayment of its contractual obligations to Popular, even assuming that NorVergence was perpetrating a fraud on its customers. See Popular Br. at 22.

Popular also takes issue with the Trustee's description of Debtor's operations as a "Ponzi Scheme" or a "Bust Out". The Trustee's description of a Ponzi scheme is incomplete and does not focus sufficiently on the requirement that in order to be considered a Ponzi Scheme, there must be an effort to disguise new investor money as profits and to funnel that new investor money to initial investors who earn outsized returns. See Plotkin v. Pomona Valley Imports, Inc. (In re Cohen), 199 B.R. 709, 718 (9th Cir. B.A.P. 1996). The Complaint does not allege facts NorVergence defrauded investors by disguising new investor money as "profits" and passing those phony profits along in the form of outsized returns to the initial investors. Popular Br. at 11. Nor has the Trustee alleged facts to show NorVergence was a Bust Out. The Complaint paints a Bust Out as "a business which places large orders with vendors on credit, never intending to repay the vendors. The products are sold to customers at cheaper than wholesale (which causes the product to move very quickly). The operator then quickly shuts things down and leaves with the money, without paying the suppliers, of course." Compl. at ¶2, n.2 (citing United States v. Crockett, 534 F.2d 589, 592 (5th Cir. 1979)). There are no allegations in the Complaint that the Debtor placed large orders with the vendors on credit with an intent not to pay vendors nor alleged the equivalent of a pre-meditated plan to avoid paying the phone carriers. See Popular Br. at 13.

In response to the Defendants motions, the Trustee asserts that he has pleaded Counts I and II

22

adequately. An actual intent fraudulent conveyance requires the establishment of two elements: 1) a transfer of an interest of the debtor in property, or any obligation incurred by debtor; and 2) with actual intent to hinder, delay, or defraud creditors. See In re Hill, 342 B.R. 183, 195-96 (Bankr. D. Del. 2001). See Trustee's Omn. Resp. at 38. A transfer of Debtor's funds to the Defendants qualifies as a transfer of debtor's property. See In re APF Co., 274 B.R. 634, 640 (Bankr. D. Del. 2001). Regarding intent, the absence of any of the enumerated badges of fraud will not preclude the finding of actual fraud. See In re Hill, 342 B.R. at 198-99. In the case before the Court, the Trustee urges that there are at least four badges present, the Debtor absconded, removal or concealment of assets, the value of the consideration received by Debtor was not reasonable equivalent to the value of the asset transferred or the amount of the obligation incurred, Debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred. See Trustee's Sur-Repl. at 6.

In addition to pleading sufficient badges of fraud, the Trustee also urges that intent can be shown by establishing the existence of a Ponzi or Bust-Out scheme. "Proof of a Ponzi scheme [will be] sufficient to establish the Ponzi operator's actual intent to hinder, delay, or defraud creditors for purposes of actual fraudulent transfers." Trustee Sur-Reply, pp. 4-7. (citing Rosen v. Neilson (In re Slatkin), 310 B.R. 740 (C.D. Cal. 2004)). It is the Trustee's contention the NorVergence business model, also characterized here as the "Salzano Scheme" resembles that of a Ponzi Scheme or Bust-Out Scheme and therefore NorVergence's intent to defraud is shown. Id. at 7. The Trustee argues here that even if the Defendants possess a good faith defense, such a defense will not stand as an appropriate challenge to the adequacy of the Trustee's claims on a motion to dismiss the Complaint under Rule 12 (b)(6). The availability of the defense must be left for discovery and/or trial.

The Trustee argues the Salzano Scheme fits within the definition of a Ponzi Scheme. The original victims were the early customers: they unsuspectingly invested in the scheme by being duped into expensive five year leases for a piece of equipment of tangential value, the matrix box. Their cash investment, however, was created by the Leasing Companies who immediately monetized the customer leases creating fast cash (investor money for NorVergence). That money, the Complaint alleges, was expended almost exclusively on the capture of new customers (victims) creating new cash for providing some telephone service (return on investment) to old customers and for lining the pockets of the principals." Trustee's Omn. Resp., pp.41-42. The argument that the

23

NorVergence scheme qualifies as a Ponzi scheme relies on In re Global Trading Invs., LLC., 2006 Bankr. LEXIS 2898 at *19 (Bankr. D.N.J. 2006). "To prove that (the debtor) engaged in a Ponzi scheme, the Trustee must establish that 1) deposits were made by investors; 2) the Debtor conducted little or no legitimate business operations as represented to investors;3) the purported business operation of the Debtor produced little or no profits or earnings; and 4) the source of payments to investors was from cash infused by new investors." Rieser v. Hayslip (In re Canyon Systems Corp.) 343 B.R. 615, 629 (Bankr. S.D. OH. 2006). Case law has revealed that a clever twist on the Ponzi concept will not remove a fraudulent scheme from the definition of Ponzi. See United States v. Sudeen, 434 F.3d 384, 286-87 (5th Cir. 2005); see also United States v. Antonakopoulos, 399 F.3d 68, 72 (1st Cir. 2005). In other words, even if Debtor's business operations do not exactly match the description of a Ponzi Scheme, the Trustee can still continue to characterize the business model as a Ponzi Scheme thereby meeting the intent prong of the fraudulent transfer or conveyance Counts. The Trustee urges that case law offers flexibility to bring NorVergence's scheme within the ambit of a Ponzi Scheme. See Trustee Omn. Resp. at 44.

The Trustee disagrees with the Defendants' claim that Count I and II do not comply with Rule 9(b). Rule 9(b) requires plaintiffs to plead with particularity the circumstances of the alleged fraud. Moreover, "bankruptcy courts have afforded greater liberality in adversary complaints brought by trustees, because the trustee pleads under a great disability due to his role as a third party outsider to the fraudulent transaction, that must plead fraud on second-hand knowledge for the benefit of the estate and all of its creditors." Id. at 46 (citing Forman v. Cornerstone Realty Agency, LLC., 2006 Bankr. LEXIS 2881 at *4 (Bankr. D.N.J. 2006); In re MacGregor Sporting Goods, 199 B.R. 502, 514-15 (Bankr. D.N.J. 1995). Also, as to Counts I and II, fraud need not be established as it is not an element of these claims. The Trustee further asserts that he does not have to repeat every element of the claim against each defendant in order to comply with Rule 9(b). See In re Genesis Health Ventures, Inc., 355 B.R. 438, 355-56 (Bankr. D. Del. 2006). (When a group of defendants are in an exclusive position of having knowledge of the factual circumstances surrounding the claims, Rule 9(b)'s heightened pleading standard should not be strictly applied).

In response to the Trustee's reply, the Defendants each submitted a separate response. Defendant Insight, Alfa Group, and CitiCapital reiterate the lack of particularity concerning the

24

allegations of fraud and actual intent. The Salzano scheme does not fit the definition of a Ponzi scheme and/or a bust out. See CitiCapital Repl. at 3; Alfa Group Repl. at 7. If a Ponzi scheme exists, arguably the movants are all unwitting victims as they lost millions of dollars. Alfa Group Resp. at 7. The complaint does not identify how the repurchase payments defrauded the creditors, especially when considering that the Leasing Companies are among Debtor's creditors. See id. It also fails to provide specificity regarding the fraudulent transfers, failing to provide any specifics as to the date, amount, and circumstances of the purported repurchase payments as to each leasing company. See id. at 8.

Defendant Popular and IFC, in addition to the points raised by Insight and Alfa, also argue the Trustee is not entitled to a more liberal pleading standard as he has engaged in an extensive investigation into NorVergence's affairs and has received cooperation from Peter Salzano. Therefore, the Forman v. Cornerstone Realty Agency, LLC. case permitting a liberal pleading standard when a trustee has encountered trouble in pursuing an investigation is not of consequence. See Popular Reply at 12; see also IFC Reply at 9-10.

To successfully pursue a claim under the version of 11 U.S.C. §548, as applicable to this case, the Trustee may avoid any transfer of interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily-

A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(ii) (I) was insolvent on the date such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.
11 U.S.C. § 548(a)(1)(2004-05 Norton).

Count II of the Complaint relies upon the lease repurchase payments also lying at the heart of Count I. Count II alleges a fraudulent transfer of property pursuant to N.J.S.A. 25:2-25 and 11

U.S.C. §544. Such payments, the Trustee asserts, were made by Debtor "with actual intent to hinder,

delay or defraud creditors by perpetuating the Salzano Scheme." Compl. at ¶ 128.

11 U.S.C. § 544(b)(1) states in relevant part:

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any
> obligation incurred by the debtor that is voidable under applicable law by a
> creditor holding an unsecured claim that is allowable under section 502 of this
> title or that is not allowable only under section 502(e) of this title.

N.J.S.A. 25:2-25 provides that a transfer made or obligation incurred by a debtor is fraudulent as to a

creditor, whether the creditor's claim arose before or after the transfer was made or the obligation

was incurred, if the debtor made the transfer or incurred the obligation:

a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and
the debtor:

    1) Was engaged or was about to engage in a business or a transaction for which the remaining
assets of the debtor were unreasonably small in relation to the business or transaction; or

    2) Intended to incur, or believed or reasonably should have believed that the debtor would
incur, debts beyond the debtor's ability to pay as they become due.

An analysis addressing actual intent to defraud a creditor is driven by factors, also known as

the "badges of fraud," set forth in N.J.S.A. 25:2-26. Truong, et al. v. Kartzman, et al., 2007

U.S.Dist. LEXIS 48614 at *10 (D.N.J. 2007). These badges of fraud include:

a) the transfer or obligation was to an insider;

b) the debtor retained possession or control of the property transferred after the transfer;

c) the transfer or obligation was disclosed or concealed;

d) before the transfer was made or obligation was incurred, the debtor had been sued or
threatened with suit;

e) the transfer was of substantially all the debtor's assets;

f) the debtor absconded;

g) the debtor removed or concealed assets;

h) the value of the consideration received by the debtor was not reasonably equivalent to the
value of the asset transferred or the amount of the obligation incurred;

i) the debtor was insolvent or became insolvent shortly after the transfer was made or the
obligation was incurred;

j) the transfer occurred shortly before or after a substantial debt was incurred; and

k) the debtor transferred the essential assets of the business to a lienor who transferred the
assets to an insider of the debtor.

Generally, the existence of one badge can "'cast suspicion on the transferor's intent...'" Id.

26

(citing Gilchinsky v. Nat'l Westminster Bank, 159 N.J. 463, 477, 732 A.2d 482 (1999). "A finding of "several in one transaction generally provides conclusive evidence of an actual intent to defraud."" Id.

The movant's opposition to Count I and II pertains to the "actual intent to hinder or defraud" elements of §548 and N.J.S.A. 25:2-25 et seq. The Trustee's task to establish intent focuses on proving Debtor's business scheme equates to a Ponzi Scheme. Upon demonstrating successfully the Salzano Scheme qualifies as a Ponzi Scheme, the actual intent to hinder, delay, or defraud creditors will be inferred. In re Bayou Group, LLC., et al., 362 B.R. 624, 633 (S.D.N.Y. 2007) (citing numerous cases in support); In re Slatkin, 310 B.R. 740, 748; In re Cohen, 199 B.R. 709, 717 (9th Cir. BAP 1996). A Ponzi scheme has been defined as

> ... a fraudulent investment arrangement under which an entity makes payments to investors from monies received from new investors rather than from profits generated by legitimate business operations, although investors may believe an actual business exists from which profits are derived.

In re Global Trading Investments, LLC., 2006 Bankr. LEXIS 2898 at * 19 (Bankr. D.N.J. 2006) (citing Rieser v. Hayslip (In re Canyon Systems Corp.), 343 B.R. 615, 629 (Bankr. S.D. OH. 2006)). The above definition of a Ponzi scheme could offer some guidance here. However, as the Trustee points out, there may be some case law permitting a broadening of the Ponzi term depending on the circumstances of each case. See, e.g., In re Bayou, 362 B.R. 624, 633-34). A test utilized to examine the presence of a Ponzi scheme requires the Trustee to prove that:

> 1) deposits were made by investors; 2) the Debtor conducted little or no legitimate business operations as represented to investors; 3) the purported business operation of the Debtor produced little or no profits or earnings; and 4) the source of payments to investors was from cash infused by new investors.

Id. (citing In re Canyon at 630).

A resolution to the question whether the Trustee can employ the "Ponzi scheme route" to establish the intent prong for Count I and II of the Complaint based on the facts of this case requires a finding of facts exceeding the scope of this motion. Further, it also appears that more discovery is required on this issue. For now, however the Court is satisfied that Count I and Count II of the

Trustee's Complaint states claims for relief "plausible on its face" and do not merely present a formulaic recitation of the elements of a cause of action. See Twombly, 127 S. Ct. at 1960, 1964-65. Accordingly, a dismissal of Count I and Count II is denied at this time.

The "badges of fraud" alleged in the Trustee's Omnibus Reply are ample to comply with the requirement of Rule 9(b)'s particularity standard. "There is no question that Rule 9(b) applies to adversary proceedings in bankruptcy which include a claim for relief under §§548 or 544..." In re Oakwood Homes Corp., et al., 325 B.R. 696, 698 (Bankr. D. Del. 2005). On its face, the Complaint is bereft of specific badges of fraud pleading. Only in the Omnibus Sur-Reply does the Trustee address some of the badges of fraud. See Omnibus Sur-Reply at 5-6. The Court, however, declines to dismiss Count I or Count II at this time and will direct the Trustee to amend the Complaint to incorporate and plead the badges of fraud.

The sufficiency of Counts I and II must be evaluated in accordance with the "particularity standard, a standard that can be satisfied with "precise allegations of date, time, or place" or by using some means of injecting precision and some measure of substantiation" into an allegation of fraud. Id. (citing Board of Trustees of Teamsters Local 683 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 167 n. 101 (3d Cir. 2002)) (quoting Naporano Iron & Metal Co. v. American Crane Corp., 79 F. Supp. 2d 49 (D.N.J. 1999)).

The Complaint in Counts I and II lists transfers involving Debtor and the Leasing Companies. Complaint, ¶ 12. The Complaint also sets forth the parties defined as the Leasing Companies. See id. at 4. The Complaint also sets forth certain aggregate amount of payments received by certain of the Leasing Companies from Debtor. Arguably, the "who and what" prongs have been plead, but the "how and when" factors have not. No specific dates for the transfers are provided, but there are indications these payments involved checks. Counts I and II advise the Defendants of the basis for the fraud allegations. Since the Trustee has identified the parties, provided a detailed account of Debtor's business operations and the role played by the Leasing Companies, and provided aggregated amounts of payments received, the Court is satisfied the particularity standard of Rule 9 has been met sufficiently to withstand a Rule 12 (b) 6 dismissal. This conclusion is proper given the "Third Circuit's relaxed standard of applying Rule 9(b) that has been carved out for bankruptcy trustees who are pleading fraudulent transfer counts. In re Oakwood, 325 B.R. at 698. (citing In re

O.P.M. Leasing Services, Inc., 32 B.R. 199, 203 (Bankr. S.D.N.Y. 1983); In re Reach Mc.Clinton & Co., Inc., 62 B,R, 978, 981 (D.N.J. 1986).

However, to the extent additional documents and information have become available after the filing of the Complaint and Plaintiff is capable of pleading with even greater specificity, the Court directs the Trustee to amend the complaint within thirty days (30) of this opinion. As the Trustee has been able to aggregate the alleged transfers as to each Leasing Company, the dates and amounts of all of the transfers are apparently available. Also, the Trustee's omnibus reply contains updated information as to the alleged lease repurchase payments. Accordingly, this Court directs the Trustee to amend Counts I and II to bring it into greater compliance with R. 9(b).

In sum, Count I and II of the Complaint will not be dismissed. Instead, the Trustee must amend the pleadings to provide more particulars of the alleged fraudulent transfers in compliance with this Opinion.

III) Count III- Set Offs by Leasing Companies within the 90 days before the Petition Date - 11 U.S.C. §553(b).

The Third Count of the Complaint alleges,

Upon information and belief, some of the Leasing Companies, during the 90 days prior to the Petition Date, adjusted their debt obligations to the Debtor by setting off amounts that they owed to the Debtor against amounts that the Debtor owed to such Leasing Companies. Upon information and belief, the balance remaining due by the Debtor as of the Petition Date, (the "insufficiency as defined under 11 U.S.C. §553 (b)(2), was less than that insufficiency of the Debtor that existed on the later of ninety (90) days before the Petition Date and the first date during the 90 days immediately preceding the Petition Date on which there was an insufficiency. To the extent that the insufficiency on the Petition Date was less than the insufficiency that existed on the later of ninety (90) days before the Petition Date and the first date during the 90 days immediately preceding the Petition Date on which there was an insufficiency, such amounts are recoverable pursuant to 11 U.S.C. § 553(b).

Compl. at 34, ¶¶ 131-133.

IFC and Popular assert that the Third Count fails to specify when such set offs were made, the amounts involved and out of which alleged customers' defaults they arose, or any other details with respect to said defendants. See IFC Memorandum at 14; See also Popular Memorandum at 22.

Thus, the Setoff claim consists of bold unsupported conclusions merely repeating §553's language. Defendant Alfa Group points to the fact that §553 "merely preserves any right of setoff accorded by state law, subject to certain limitations." Alfa Group Memo at 17.   The common law of setoff, including New Jersey law of setoff, requires mutuality of obligations between the parties in order for the right of setoff to exist. Id. (citing In re Pineview Care Center, 142 B.R. 677, 683 (Bankr. D.N.J. 1992).   In addition to the mutuality of obligations requirement, a setoff claim must also meet the "improvement in position" test that prevents the creditor from using a set off to put itself in a better position than it was in prior to the ninety (90) day pre-petition period. See In re Wild Bills, Inc., 206 B.R. 8, 14 (Bankr. D. Conn. 1997) (citing Turner v. Small Business Administration (In re Turner), 96 F. 3d 465, 468 (10th Cir. 1996)).   The allegations in the Complaint, it is argued, are bereft of the necessary factual averments and the Setoff claim must be dismissed pursuant to Rule 12 (b)(6). See Alfa Memo at 19.

In the opposition papers, the Trustee acknowledges the law of set off requires mutuality of obligations between the parties, i.e. mutual pre-petition debts owing from the debtor to the creditor and from the creditor to the debtor, and the relevance of the "improvement in position" test. Trustee Omn. Resp. at 50.  As evidence of mutual obligations between Debtor and the Leasing Companies, the Trustee points to the MPA's the parties executed. The MPA's created obligations of the Leasing Companies to purchase leases from NorVergence and also created obligations on the part of Debtor to repurchase leases from the Leasing Companies. See Trustee's Omn. Resp.at 51; see also Compl. Ex. C.  Moreover, the Trustee asserts that the Complaint states that a number of the Leasing Companies would underfund a lease deal or hold back as much as 25% to 50% of the amount that was otherwise due to NorVergence on each lease as a hedge." See Trustee Omn. Resp. at 51; see also Compl., ¶ 108.  The Trustee further asserts that since the date the Complaint was filed, the Trustee has been able to discover $2,644.249.38 in setoffs by Popular Leasing in the 90 days prior to the Petition Date, as well as the following additional 90-day offsets by Moving Defendants:

| | |
|---|---|
| Alfa/OFC | $168,489.82 |
| IFC | $704,892.76 |
| Liberty | $ 57,962.18 |
| PFG | $ 32,775.94 |
| Sterling | $ 65,935.80 |

While no 90 day offsets have yet been discovered against Moving Defendants CitiCapital,

Dolphin, FirstLease or Insight, such information is difficult for the Trustee to ascertain and will

be within the knowledge of the specific defendants. Therefore any final adjudication as to these

four defendants should await the exchange of discovery. Id.

Defendant Alfa Group, in response to the Trustee's Omnibus Brief in Opposition, points to

the inadequacy of the Setoff pleading. "Count III of the Complaint merely alleged that some of the

Leasing Companies," during the ninety (90) days prior to the Petition Date "adjusted their debt

obligations to NorVergence..." Alfa Repl. Br. at 8. In the Complaint, the Trustee also conceded that

"[i]t is unknown how much the Leasing Companies were paid in addition, on account of Lease

Repurchase Obligations under the MPA's by way of set-off." Id. Further, the Trustee asserts "a

number of the leasing Companies would underfund a lease deal or hold back as much as 25% to 50%

of the amount that was otherwise due to NorVergence on each lease as a hedge." Id. at 9.   Due to

the fact that the Leasing Companies did not act as a group or syndicate, the Trustee must allege the

exact amount of repayment obligations allegedly owed by NorVergence to each Leasing Company.

The Trustee may not group the Leasing Companies to allege that all of them owed obligations to

NorVergence. See Alfa Repl. at 8-9. All of this demonstrates the lack of specifics regarding Count

III.  The Trustee's opposition brief updates the amount of setoffs and alleges additional setoff

amounts in connection with certain Defendants. According to Alfa Group, this information may not

be considered by the Court as the Trustee cannot amend the Complaint by a brief in opposition to a

motion to dismiss. See id. at 10. (citing Commw. of Pa. Ex. Rel Zimmerman v. PepsiCo, Inc., 386

F.2d 173, 181 (3d Cir. 1988); Marks v. Struble, 347 F. Supp. 2d 136, 148 (D.N.J. 2004).

Another deficiency with the pleading of Count III, Defendant Popular contends, is the

Trustee's argument that the MPA executed between NorVergence and Popular created mutual

obligations sufficient to form the basis of a setoff claim against Popular and the other Leasing

Companies.  Popular posits that the MPA created no obligation on the part of Popular to "purchase

leases" from Debtor, but rather gave Popular the discretion to approve or disapprove a Lease for

assignment. Popular Repl. Br. at 24.  Thus, the Trustee's statement is incorrect and the Complaint

31

itself points to no mutuality of obligation between NorVergence and Popular. See id.

By way of the Trustee's Omnibus Sur-Reply, the Trustee notes that none of the Leasing Companies contest NorVergence's indebtedness to the Leasing Companies. As a matter of fact seven of the ten Movants have filed Proofs of Claim alleging more than $26,000,000.00[23] owed by NorVergence. With respect to a mutual obligation, the Trustee asserts, Popular "stands alone in alleging that because it had discretion under its MPA as to whether or not it would purchase leases from the Debtor it did not owe any obligation to NorVergence in the ninety days pre-petition period." Trustee Omn. Sur. Repl at 8. However, the Trustee asserts that when Popular opted to acquire a Lease from NorVergence, it obviously had to pay for the Lease thereby creating a mutual obligation. See id.

The Trustee also asserts that Fed. R. Civ. P. 8 (Notice Pleading) is of relevance, not Fed. R. Civ. P. 9, because a setoff claim based on 11 U.S.C. §553 does not allege fraud. All the Trustee must accomplish is to provide notice to the Leasing Companies of the nature and grounds upon with he seeks judgment against the Companies. Id. at 8. The Trustee asserts that Count III of the Complaint accomplishes exactly this and should not be dismissed.

Section 553(b) states in pertinent part:

> ... if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that

---

[23] Exhibit "A" to the Trustee's SurReply summarizes Defendants Proofs of Claim:

| | |
|---|---|
| Insight Financial | $317,490.47 |
| Alfa/OFC | $6,674,495.00 |
| CitiGroup | $590,618.97 |
| Dolphin | $32,119.93 |
| National City, f/ka ILC, f/ka PFG | $2,500,000.00 |
| Sterling | $1,120,000.00 |
| IFC Credit | $15,368,827.75 |
| TOTAL - | $26,603,552.12 |

any insufficiency on the date of such setoff is less than the insufficiency on the later of-

A) 90 days before the date of the filing of the petition; and

B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

(2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.

11 U.S.C. § 553(b).

A setoff claim must be evaluated pursuant to Fed. R. Civ. P. 8(a). Therefore, a properly pleaded claim must contain "a short and plain statement showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff need not state facts with such specificity so as to constitute a cause of action so long as the Complaint affords fair notice to the adversary of the nature and basis of the claim asserted. In re APF Co., et al., 264 B.R. 344, 354 (D. Del. 2001) (citing Schaedler v. Reading Eagle Publ'n, Inc., 370 F.2d 795, 798 (3d cir. 1967)).

The Complaint contains a setoff claim which targets all of the defendant movants by definition but provides insufficient information regarding the specific transactions. As Alfa Group and other moving defendants contend, Count III contains general and vague characterizations. For instance, it is alleged that "some of the Leasing Companies, during the 90 days prior to the Petition Date, adjusted their debt obligations to the Debtor by setting off amounts that they owed to the Debtor against amounts that the Debtor owed to such Leasing Companies." Compl. at ¶ 131. Elsewhere in the Complaint, the Trustee notes "[i]t is unknown how much the Leasing Companies were paid in addition, on account of Lease Repurchase Obligations under the MPA's, by way of set-off, since NorVergence's record keeping does not appear to have captured such set-offs." Id. at ¶ 112.

The Trustee's Omnibus Brief in Opposition is more specific. Not only does it discuss the law of setoff, the mutuality of obligations and the improvement in position elements of the Trustee's setoff claim, the Brief also seeks to supplement the Third Count of the Complaint by asserting that "since the date the Complaint was filed, the Trustee has been able to discover $2,644,249.38 in setoffs by Popular Leasing in the 90 days prior to the Petition Date," as well as setoffs by Alfa/OFC

33

in the amount of $168,489.82; IFC $704,892.76; Liberty $57,962.18; PFG $32,775.94; and Sterling $65,935.80. Opp. Br. at 51. As of January 24, 2007, the date of the filing of the Trustee's Brief, the Trustee states "[n]o 90 day offsets have yet been discovered against Moving Defendants Citicapital, Dolphin, FirstLease or Insight. This information has been difficult for the Trustee to [ascertain] and will be within the knowledge of the specific defendants. Therefore any final adjudication as to these four defendants should await the exchange of discovery." Id. In the Trustee's Sur-Reply, the Trustee asserts that the Debtor's books and records reveal setoffs to IFC in the amount of $708,244.86.

See Id. at 29 and Exh. C; Certification of Cindy J. Alvarado, ¶6.

The Court must examine the Complaint's Count III and any exhibits attached to the Complaint as is. Case law is clear, "[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." Commonwealth of Pa. v. PepsiCo., Inc., 836 F. 2d 173, 181 (3d Cir. 1988) (citing Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984), cert. denied, 470 U.S. 1054, 84 L. Ed. 2d 821, 105 S. Ct. 1758 (1984)). Count III of the Complaint presently fails to comport with Rule 8(a)(2). The Complaint presently alleges that only some of the Leasing Companies have engaged in invalid setoffs. The Complaint should set forth specifically the Trustee's setoff claims as against each individual defendant.

Based on Pepsi Co., supra, the Trustee is directed, within Thirty (30) days of the date of this Opinion, to amend Count III of the Complaint and to remedy the deficiencies outlined herein. In the event more information has been discovered to date, the Trustee should amend Count III accordingly. The Court is satisfied, nonetheless, that Count III of the Complaint sets forth claims for relief "plausible on its face" and not merely a formulaic recitation of the elements of a cause of action to withstand dismissal under Twombly at this time.

IV) Count IX- Accounting and Turnover- 11 U.S.C. §542.

Due to the Trustee's consent to the dismissal of Count IX, the Turnover claim, Count IX of the Complaint is dismissed.

V) Count X- Aiding & Abetting a Breach of Fiduciary Duty; Count XI- Aiding & Abetting a Fraud.

A) Count X-Aiding & Abetting a Breach of Fiduciary Duty

Count X of the Complaint sounds in the breach of fiduciary duties of good faith, due care and loyalty of Defendants Salzano and several corporate insiders. The Trustee alleges these Defendants breached their duties by "arranging for and facilitating transactions with NorVergence in which they and the other Insiders derived an improper personal benefit at the expense of the company." Complaint ¶ 189. In each of these transactions, Salzano and the Insiders breached their fiduciary duties by "failing to disclose to the company all material facts of each such transaction and/or by deliberately failing to supervise these transactions." Id. In addition to receiving their regular salary, their company credit card use and other benefits, the Insiders, it is asserted, received at least $854,000.00 during the time the Salzano Scheme existed. See id. The Trustee alleges here that "By virtue of the acts and omissions described in this Complaint the Leasing Companies knowingly gave substantial assistance to Salzano and the Insiders to perpetuate the Salzano scheme by giving them the means to continue the Salzano scheme, with actual knowledge that the transactions the Leasing Companies benefited from, were fraudulent." Id. at ¶ 191.

B) Count XI-Aiding & Abetting a Fraud

It is alleged the actions by Salzano and the other Insiders constituted a fraud against customers, creditors and investors as the Insiders were running the "Salzano Scheme" for their own benefit and to the detriment of creditors, investors and customers. Id. at ¶ 194. Part of the scheme involved the use of sales scripts with false statements used to induce customers to enter into long term, non-cancelable contracts with the Leasing Companies. Id., ¶ 195. These scripts contained false statements upon which the customers relied and ultimately caused the customers and NorVergence to suffer damages. Id., ¶¶ 198-199.

It is alleged that "Given the nature of the Salzano Scheme as a Ponzi/Bust-Out, one or more of the Leasing Companies participated in and/or possessed actual knowledge that the Salzano Scheme was designed to or would benefit Salzano and/or an insider." Id. It is alleged here that "One or more of the Leasing Companies gave substantial assistance to Salzano and the Insiders by giving them the means to continue the Salzano Scheme with actual knowledge that the transactions the

Leasing Companies were benefiting from were fraudulent." Id. As a result, the Leasing Companies injured and damaged NorVergence when the former's debt was wrongfully expanded out of proportion to its ability to repay, pushing Debtor into insolvency and bankruptcy. See id., ¶ 202.

### C) Movants' Perspectives

Similar objections lodged against Counts I, II, and III are also raised regarding Count X and XI. New Jersey law requires a claimant to demonstrate the party aided by the defendant performed a wrongful act causing an injury; 2) awareness on the part of the defendant of his role as part of an overall illegal or tortortious activity at the time he provided assistance and 3) the defendant must have knowingly and substantially assisted the principal in committing the illegal act. See State Dept. of Treasury, Div. of Investment, ex rel. McCormac v. Qwest Communications, 387 N.J. Super. 469, 483-484, 904 A.2d 775, 783-84 (N.J. Super. 2006) (citing Rest. (Second) of Torts (1979)); see also Morganroth v. Norris McLauglin & Marcus, P.C., 331 F.3d 406, 415 (3d Cir. 2003). Defendants argue the Complaint is "completely devoid of any specific facts as to when or how [Defendants] gained any actual knowledge of the alleged fraud committed by Salzano and the Insiders or participation therein." IFC Brief at 14-15; see Insight Br. at 12-13; see Alfa Group Br. at 22; see Popular Br. at 27-29, 35; USXL Brief at 11. It is also silent as to the who, what, when, where and how the Defendants became aware of the deceptive or fraudulent practices. See id. In sum, the Trustee has made broad, sweeping generalizations without adhering to Rule 9(b)'s command to plead fraud based claims with particularity. See id.; see Alfa Group Br. at 23; USXL Br. at 11-12..

Apart from a lack of facts properly connecting the moving defendants to the Salzano Scheme in a manner the Trustee posits, Defendant Popular also raises the Trustee's standing to pursue the aiding and abetting a fraud claim if the Trustee is attempting to bring that claim on behalf of NorVergence's former customers, creditors or investors. Id. at 32. See Compl. at ¶¶ 194-198. To the extent the Trustee is attempting to bring the Fraud Count on behalf of these parties and not Debtor's estate, the Trustee lacks standing. See Caplin v. Marine Midland Grace Trust Co. of New York, 406 U.S. 416, 434; 92 S. Ct. 1678, 32 L. Ed. 2d 195 (1972).

Under Rule 9(b) as applicable to the aiding and abetting a fraud claim, Alfa Group asserts that pleadings involving multiple defendants must specifically allege the individual action committed

by each defendant. See Poling v. K. Hovnanian Enters., 99 F. Supp.2d 502, 508 (D.N.J. 2000). Alfa asserts that the Trustee's Complaint fails to differentiate the alleged actions, knowledge and/or participation level of the individual Leasing Companies and does not deal with the differences among the various MPA's executed between Debtor and the Defendants. See Alfa Group Br. at 24. The blanket, highly generalized, conclusory allegations run counter to Rule 9.

Defendants argue that the MPA's, which were freely negotiated and executed between the parties established legitimate business relationships between Debtor and the Leasing Companies. Id. at 25; see Popular Br. at 29. According to the Trustee, the decision by the Leasing Companies not to conduct customer interviews during the credit approval process, the determination of the assignment price by NorVergence, and the MPA's "first rental default" provision evidence knowledge and or participation by the Leasing Companies. Alfa Group takes issue with this contention and asserts "a mere business relationship with NorVergence does not equate to the Leasing Companies' substantial participation in, with actual knowledge of, the alleged Salzano scheme." Alfa Group Br. at 26. Moreover, the repurchase obligations of NorVergence to the Leasing Companies were bona fide debts. These MPA provisions cannot form the basis of aiding and abettor liability for the alleged bad acts of the D& O's. See Popular Br. at 29 (citing In re Sharp International Corp., 403 F.3d 43, 52 (2d Cir. 2005)). The transactions between the leasing companies and Debtor "were typical in the equipment leasing industry" and nothing plead in the Complaint demonstrates that the leasing companies acted other than with good faith. Id. at 30.

In addition to failing to provide specifics concerning the aiding and abetting claims against the Moving Defendants, Defendants also assert that Count X and XI (and XII – Deepening Insolvency) are barred by the affirmative defense of the in pari delicto doctrine. See Insight Br. at 9; see Popular Br. at 30; USXL Br., pp. 4-7. The doctrine provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim. This doctrine operates to bar a bankruptcy trustee from litigating against a defendant where a Debtor allegedly has participated in the underlying malfeasance. See Official Committee of Unsecured Creditors v. Lafferty & Co., 267 F.3d 340, 354 (3d Cir. 2001).

A court will impute fraud by a corporation's officer or agent to the corporation if the fraud is committed 1) in the course of the employment and 2) occurred for the benefit of the corporation. Id.

at 358. In the case of Debtor, the Trustee here advances allegations that D & O fraud took place during the course of employment when said parties carried out the Salzano Scheme. See Compl. at ¶¶ 1-14, 48-89, 114-122, 134-151. Further, the Complaint also presents extensive allegations that the Debtor directly benefited from the D & O's bad acts by receiving revenue from Lease payments from customers and cash from the sale of Leases to the Leasing Companies. As the Trustee alleges, "[t]he Salzano Scheme caused hundreds of millions of dollars to be funneled into the business.'" See Compl. at ¶¶ 10, 66, 76, 80, 111, 115, 119, 208. This, according to Popular, shows the Salzano Scheme clearly benefited NorVergence. In light of the above, it is argued that the Lafferty test for imputing fraud to the Debtor has been met and, hence, the In Pari Delicto defense operates to bar Counts X and XI. While Defendant Insight and other moving Defendants recognize the custom of courts generally not to consider affirmative defenses on a motion to dismiss, see id. at 9;USXL Br.at 6, Defendants argue that dismissal is appropriate where the affirmative defense appears on the face of the Complaint. See In re Student Finance Corp., 335 B.R. 539, 547 (D.Del. 2005), (citing Leveto v. Capina, 258 F. 3d 156, 161 (3d Cir. 2001))( indicating that an exception is made for situations where the application of the defense appears on the face of the complaint). Here, Defendants assert that "[t]he Complaint contains scores of allegations of knowing and intentional wrongdoing on the part of the Debtor's officers and insiders acting in the scope of their positions with the Debtor," Insight Comp. at 10; see also USXL Br. at 7, and accordingly, Counts X and XI must be dismissed.

### D) Trustee's Response

In the Omnibus Brief in Opposition to the Motions to Dismiss, the Trustee addresses at length the validity of Count X (Aiding and Abetting a Breach of Fiduciary Duty) and XI (Aiding and Abetting a Fraud) and the inapplicability of the in pari delicto defense. The Trustee urges that in the present case, "Salzano and his cohorts' implementation of the Ponzi/Bust-Out Salzano Scheme and their looting of the company as alleged in the Complaint was a breach of their fiduciary duties to NorVergence and . . . a fraud." Id. at 54. It is alleged in the Complaint the Leasing Companies knew that Salzano and the other Insiders were putting in place the Salzano Scheme, i.e. breaching their fiduciary duties to Norvergence and defrauding the company by defrauding customers and by looting the company. Id. Although Rule 9(b) provides that intent, knowledge and other conditions of mind may be averred generally, the Complaint, according to the Trustee, sets forth numerous specific

38

factual bases for this allegation and the belief that the Leasing Companies "knew," "participated in," and "gave substantial assistance to the Salzano scheme, including:

> 1. The fact that "the Leasing Companies lowered their requirements, making it easier for NorVergence to continue conducting business, even as hundreds and hundreds of customers were defaulting, [and] customers were complaining." Compl. ¶¶ 111, 115, 191, 201 & 204.
> 2. The unexplainable variations in pricing of the same piece of equipment financed by the Leasing Companies on the exact same day. Compl. ¶¶ 97-99
> 3. Salzano's public record of running telecommunication companies into bankruptcy
> 4. Salzano's public record of regulatory problems with the Federal Communications Commission
> 5. NorVergence's targeting of unsophisticated small businesses
> 6. NorVergence's false scripts and the Leasing Companies participation in those Scripts. Compl. ¶¶ 104-107, 195.
> Id. at 54.

With regard to the Leasing Companies rendering substantial assistance and their participation in the fraud, the Trustee reiterates his position that the Companies played an essential role in the Salzano scheme. The Companies provided the funds through funds obtained from new Customer Leases sold to the Leasing Companies which fueled and magnified the scheme. Id. (citing Compl. at ¶191; ¶ 80). The Defendants continued to purchase the leases despite their knowledge of the aforesaid improprieties, believing all along that the defrauded NorVergence customers would be bound to cover the Leasing Companies' investments and their expected profits from those investments. See id. citing Compl. ¶ 73).

The Trustee also attempted to rebut Insight and Alfa Group's "claim that the Complaint improperly attempts to smear the Defendants with the broad brush of the fraud adjudicated against IFC" id. based on a Texas court case finding Movant IFC, as Leasing Company, liable in a situation the Trustee characterizes as similar to the instant matter. Like IFC, the Trustee asserts that these two Defendants had a "60-day "First Payment Default" in their MPA contract with Debtor. Like IFC, the Trustee alleges that each Leasing Company was aware of excessive customer dissatisfaction as early as late 2003, yet continued to finance and collect millions in First Payment Defaults through June of 2004. Id. The Trustee also states that "[i]f the Complaint is required to be amended, the Trustee will refer to Popular's President addressing NorVergence as his "business partner" and will further allege

Popular's intimate knowledge with NorVergence's fast and loose business practices, NorVergence's severe cash flow problems and its extensive customer dissatisfaction as early as late 2003. Popular continued to support and enable "the business" though June of 2004." Trustee Br. at 56 n. 22.

On the issue of standing, Movant Popular argues the Trustee lacks the standing to pursue Count XI (Fraud and Aiding and Abetting a Fraud) on behalf of NorVergence's former customers, creditors or investors." Popular Br. at 32. Pursuant to Bankruptcy Code §541 (a)(1), the bankruptcy estate includes all legal and equitable interests of the debtor in property as of the commencement of the case. This definition includes legal causes of action. Board of Trustees of Teamsters Local 863 Pension Fund. v. Foodtown, Inc., 296 F.3d 164, 169 (3d Cir. 1992). The Trustee acknowledges case law holding that, except for avoidance claims, a Trustee does not possess standing to sue on behalf of creditors and may only bring claims possessed by the Debtor as of the petition date. The Trustee urges that "Counts Ten and Eleven allege exactly that." Trustee Omn. Br. at 57. These claims involve damages sustained by NorVergence as a result of the insiders and the Leasing Companies. Compl. ¶¶ 192, 199, 202.

Moving Defendants also argue the Trustee's claims must be dismissed because of the availability of the in pari delicto defense. The trustee notes that case law distinguishes between the statutory and avoidance claims arising in favor of the Trustee under the Bankruptcy Code (Counts I, II, and III) and state law claims under §541 (Counts X, XI, and XII). Courts have found the In Pari Delicto defense to be inapplicable when a trustee brings an action under §§ 544(a), 544 (b) or 548, but applicable to §541 based actions. See In re The Personal and Business Insurance Agency, 334 F. 3d 239 (3d Cir. 2003); see also In re Fusion Technologies Group, Inc., 332 B.R. 225, 232 (Bankr S.D. Fla. 2005). Thus, the defense can only be invoked regarding the Trustee's § 541 claims - Counts X, XI and XII.

Generally, an affirmative defense cannot be used to support dismissal of a complaint under Rule 12(b)(6). See In re Total Containment, Inc., 335 B.R. 589, 606 (Bankr. E.D. 2005). Only when the defense's validity is clear from the facts asserted by plaintiff on the face of the complaint, can it be utilized. Id. In the instant case, the applicability of any pari delicto defense depends on an evaluation of sensitive facts, an analysis of which must only take place after discovery has run its course. See Bondi v. Citigroup, Inc., 2005 WL 975856 at *14. (N.J.Super. 2005).

The Trustee and movants also differ with respect to the imputation of the Insider's conduct to NorVergence, and in turn, to the Trustee, who stands in Debtor's shoes. "The Controlling precedent as to New Jersey law on the imputation doctrine, the Trustee contends, is NCP Litigation Trust v. KPMG, LLP., 187 N.J. 353, 901 A. 2d 871 (2006). In NCP, KPMG, the debtor's former auditors, sought to bar the Trust's suit against it for negligence, breach of fiduciary duty and other claims, on the grounds that the fraud, as it had been engineered by Debtor's insiders, must be imputed to the Debtor, and therefore to the Trust as the corporate successor-in-interest. See id. at 364. On appeal, the New Jersey Supreme Court determined the defense to be unavailable as the debtor's agents did not directly defraud an innocent third party. They defrauded the corporation and its creditors instead. In that respect, KPMG is not a victim of the fraud in need of protection. See id. at 371-72. The Trustee argues that since the Complaint here expressly states facts attributing active participation in the Insiders' wrongdoing to Defendants, imputation and therefore, in pari delicto, are not available defenses under the NCP case. Trustee Omn. Br. at 73, (citing Compl. ¶¶ 62, 73, 78, 90-111, 115, 191, 201, 204).

In addition to the unavailability of imputation under the facts of this case, the Trustee urges that the Adverse Interest exception to the in pari delicto defense also precludes imputation. Under the adverse interest exception, fraudulent conduct will not be imputed to a corporation if the unlawful actions by its management were adverse to the corporation and benefited management or a third party. See Bondi v. Citigroup, 2005 WL 975856 at *14; see also Lafferty, supra, 267 F.3d at 359. According to the Trustee, Thomas Salzano "acted at all times with an "adverse interest" toward creditors and NorVergence." Trustee Omn. Br. at 74. The Trustee states that the Insider Defendants who have answered the Complaint claim they operated a legitimate business and portray Salzano as a party acting at the expense of NorVergence. Id. at 75, (citing Answer and Pretrial Memo of Defendant Terry Skemer). The issue of whether Salzano acted adversely to NorVergence or whether NorVergence itself was the bad actor, the Trustee urges, must await the conclusion of discovery and trial, making the dismissal of the Complaint on in pari delicto grounds under Fed. R. Civ. P. 12(b)(6) inappropriate at this time. Id.

E) Movants' Reply
Defendant Alfa Group's Reply reiterates the same points raised in its Brief in favor of the

dismissal of the Complaint. An aiding and abetting claim requires the Trustee to plead "actual knowledge" of the breach and an affirmative act of participation by the aider and abettor in the fiduciary duty breach. The Trustee, for the first time, alleges that the Leasing Companies should have considered Salzano's prior business history and NorVergence's alleged targeting of unsophisticated small business. However, according to Alfa, a complaint may not be amended by a brief in opposition to the motion to dismiss. See Alfa Repl. at 11-12. In addition in the context of both aiding and abetting a breach of fiduciary duty and a fraud, the underlying fraudulent conduct as well as the substantial assistance required for aiding and abetting must meet the heightened pleading requirement of R. 9(b). See Neilson v. Union Bank of California, N.A., 290 F. Supp. 2d 1101, 1129-30 n.81 (C.D. Cal. 2003); Sharp In'l Corp., 302 B.R. 760, 770 (Bankr. E.D.N.Y. 2003), aff'd 403 F.3d 43, 49-53 (2d Cir. 2005). The Complaint, it is urged, fails to make any differentiation among the alleged actions, knowledge, and/or participation level of the individual Leasing Companies. See id; see also Insight Repl. at 9. Rule 9(b) is simply not followed by the Trustee.

Defendants also argue that any reliance on the "adverse interest exception" to the In Pari Delicto defense is erroneous. In order to avail himself of the exception, the Trustee argues NorVergence was a victim of Salzano while depicting NorVergence as an active engineer and executioner of the fraudulent scheme. See Compl. at ¶¶ 82-85; see also Trustee's Omn. Br., pp.-73-75. This inconsistent use of the facts highlights the weakness of the Trustee's position. See Alfa Repl. at 12; see also Popular Reply at 20; see also USXL Br., ¶17.

Also, the Trustee ignores the "sole actor" exception to the "adverse interest exception", as the Alfa, Popular and CitiCapital's replies point out. If an agent is the sole representative of a principal, then the agent's fraudulent conduct is imputable to the principal's regardless of whether that agent's conduct was adverse to the principal's interest. See McNamara v. PFS (In re Personal & Bus. Ins. Agency), 334 F.3d 239, 243 (3d Cir. 2003); (citing Lafferty, supra, 267 F.3d at 359. If Salzano is regarded as the actual mastermind and principal of NorVergence, as alleged in the Complaint, the "sole actor" exception will invalidate the Trustee's argument that imputation is unavailable. Alfa Repl. at 14.

The Trustee's interpretation of NCP Litigation Trust v. KPMG, LLP., 901 A.2d 871 (N.J. 2006) is also contested. Popular asserts that the Trustee misconstrues the decision. Popular asserts

42

that in NCP, a litigation trust brought claims against KPMG for negligence, negligent misrepresentation, breach of contract and breach of fiduciary duty. KPMG defended itself by arguing that the fraudulent conduct of the NCP officers involved with perpetrating the fraud was imputed to PCN and ultimately to the trust as its successor. As a result, the trust could not recover damages for KPMG's failure to fulfill its duty to detect the fraud. In essence, KPMG was arguing that the existence of the fraudulent acts by PCN's directors absolved the accounting firm of its contractual obligation to detect that very same fraud. The New Jersey Supreme Court disagreed with KPMG's reasoning and "essentially created a carveout to the general imputation doctrine in cases where outside auditors are themselves negligent in their duties to the corporation." Popular Repl. at 17; CitiCapital Repl. at 5. Popular argues that the existence of the auditor's independent tort liability to the corporation was central to the NCP decision and this proposition has been completely ignored by the Trustee when relying on NCP. Id.

In this case, Popular urges it was under no obligation, contractual or otherwise, to investigate NorVergence's internal financial machinations. Popular possessed no duties to NorVergence that were even roughly akin to the contractual obligations KPMG proposed as an outside auditor to investigate PCN's financial matters. For this reason, the NCP case does not apply to the case at hand "and the fraudulent acts of Debtor's D&O's are imputable to the Trustee and the NCP case does not undercut that conclusion in the slightest." Id. at 18.

F) Trustee's Omnibus Sur-Reply

According to the Trustee, the moving Defendants' argument regarding the inadequate pleading of the Trustee's claims against them is deficient in several ways. First, the Defendants apply Rule 9(b) with too broad a brush, ignoring the specific elements within the Counts and applicable law. Claims for breach of fiduciary duty [Count Ten] are not subject to the heightened pleading requirement of R. 9(b). Rothman v. Specialty Care Network, Inc., 2000 U.S. Dist. LEXIS 15433 at *10 (E.D. Pa. 2000) (internal citations omitted). The same holds true for claims of aiding and abetting a breach of fiduciary duty. See TMP Worldwide, Inc., v. Inacom Corp. (In re Inacom Corp.), 2001 Bankr. LEXIS 1297 * 6 (D. Del. 2001). Similarly, R. 9(b)'s particularity requirement is not applicable to the scienter element of Count XI. "Malice, intent, knowledge, and other conditions

of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).    Thus, knowledge of a primary actor's violative conduct, which is an element of the Trustee's claims in Count X, XI (and XII) may be pleaded generally.  The Rule's heightened particularity requirement is simply not applicable as to the knowledge or intent of the Leasing Companies.

The Trustee disputes the Moving Defendants' contention that the Trustee has failed to state the alleged misconduct with particularity.  Mere grouping of allegations against Defendants is permitted when the precise misconduct alleged in the Complaint is substantially similar.  So long as "a plaintiff alleges sufficiently particularized allegations, there is no per se rule that group pleading cannot satisfy Rule 9(b)." In re Genesis Health Ventures, Inc., 355 B.R. 438, 455 (Bankr. D.Del. 2006).

The Trustee, in Counts Ten and Eleven must plead 1) "knowledge" by the Leasing Companies of the violative conduct, and 2) the provision of "substantial assistance" or "encouragement" by the Leasing Companies, (citing Bd. of Trs. v. Foodtown Inc., 296 F.3d 164, 174 (3d Cir. 2002). On knowledge, the Complaint refers to numerous customer complaints. See Compl. ¶¶ 108-109, 105. The leasing companies' knowledge of grossly differing prices for identical matrix boxes being charged by NorVergence and the Leasing Companies funding grossly different amounts for identical equipment. (see Id. ¶¶ 96, 98); investigations by the Attorneys General of 27 states into the activities of many of the leasing companies, including IFC, Popular, ILC, Irwin, Liberty and Northland, and settlements reached with many of the Leasing Companies, (Compl. ¶ 100), which provide at least an inference, at the pleading stage, of knowledge.  Additional signs of the Movants' knowledge are the agreement of a number of Leasing Company defendants not to speak to customers at all in order to confirm a customer's receipt of the lease equipment or otherwise (see Compl. ¶¶ 102, 106-107), and "other leasing companies agreeing to read a NorVergence script to customers to confirm delivery and acceptance, which script, among other things, promised service to the customers, service which often times was not delivered." Compl. ¶ 104. Also, a Texas court, finding that based on these facts alone, one of the Leasing Companies was an actual participant in NorVergence's fraud. See Compl. ¶ 105; Trustee Omn. Sur-Repl. at 19.

As far as providing substantial assistance or encouragement is concerned, the Complaint alleges the Leasing Companies funded hundreds of millions of dollars into NorVergence, in return

44

for assignments of obligations from defrauded customers, enabling NorVergence to continue the Salzano Scheme. See Compl. ¶ 90. It also claims the Leasing Companies actually lowered their requirements for funding transactions as the customer defaults increased. See id. ¶ 112. The Leasing Companies continued to fund Debtor despite increased knowledge of customer complaints and the declining affairs at NorVergence. See id. ¶ 113. Admittedly the Trustee does not know exactly when CitiCapital, Alfa or Popular or any other Leasing Company Defendant, gained specific knowledge of the fraud, however, he is familiar with the circumstances pursuant to which the Leasing Company Defendants "knew or should have known" of it and so alleged them clearly in the complaint. Tr. Omn. Sur-Rep. at 20.

The Trustee urges that the Moving Defendants ignore the principle that Rule 9(b) "should be interpreted liberally, particularly when the Trustee, a third party outsider to the fraudulent transaction, is bringing the action." In re MacGregor Sporting Goods, 199 B.R. 502, 515 (Bankr. N.J. 1995).; see also Seville Indus. Machinery Corp., 742 F.2d 786, 791 (3d Cir. 1984). Nevertheless, the Trustee opines, the Complaint meets even a strict (non-bankruptcy) application of Rule 9(b). See Trustee. Omn. Sur-Repl. at 24.

The Trustee's Sur-Reply also addresses the application of the in pari delicto defense. The Trustee urges that the defense has only bearings on Section 541 claims and is a defense limited to Counts X, XI and XII. Id. at 10. Further, any attempt to invoke the affirmative defense is premature. In the instant case, the facts are not uncontroverted and the Trustee's claim to the "adverse interest exception", coupled with the Defendant's use of the "sole actor" exception to the exception requires the Court to make intensely fact sensitive findings that cannot be determined on the pleadings. Accordingly, the Complaint cannot be dismissed at this time. Id. at 14.

The Sur-Reply also addresses NCP v. Litigation Trust v. KPMG, LLP, 187 N.J. 353, 901 A. 2d 871 (2006). As discussed above, Popular and CitiCapital argue the NCP Court formulated a carve-out to the general imputation doctrine in cases where outside auditors are themselves negligent in their duties to the corporation. According to the Trustee, the NCP Court stated the existing general rule that imputation may be effected only where the defendant is an innocent victim of the fraud, and then defined "innocent" to exclude auditors who commit negligence, justifying that exclusion in part by noting their negligence was more than incidental, since the auditors were

contractually obliged to perform the vigilance they failed to perform. Trustee Omn. Sur-Repl. at 12. As NCP and its preceding decisions make clear, New Jersey law restricts any defendant who is not an innocent party from imputing wrongdoing to the Debtor. Accordingly, the Trustee argues, the imputation defense (and therefore the in pari delicto defense) cannot be asserted by the Moving Defendants in this case. See id. at 14.

G) Court's Findings

1) Sufficiency of Count X and XI's Pleadings

The Tenth and Eleventh Counts allege the movants aided and abetted Debtor's corporate insiders in breaching their fiduciary duties and their commission of fraud. Under New Jersey law, a claim of aiding and abetting consists of the following elements: "1) the commission of a wrongful act; 2) knowledge of the act by the alleged aider-abettor; and 3) the aider-abettor knowingly and substantially participated in the wrongdoing." Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C., 331 F.3d 406, 415 (3d Cir. 2003) (citing Monsen v. Consol. Dressed Beef Co., Inc., 579 F.2d 793, 799 (3d Cir. 1978); Elysian Fed. Savings Bank v. First Interregional Equity Corp., 713 F. Supp. 737, 760 (D.N.J. 1989)). In addition to these elements, in order to be found liable for aiding and abetting a breach of a fiduciary duty, it must also be established "that the party knew that the other's conduct constituted a breach of a fiduciary duty and gave substantial assistance or encouragement to the other in committing that breach." Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc., et als., 296 F.3d 164, 174 (3d Cir. 2002) (citing Resolution Trust Corp. v. Spagnoli, 811 F. Supp. 1005, 1014 (D.N.J. 1993)). See also Twenty First Century, L.P. v. LaBianca, et al., 19 F. Supp. 2d 35, 41 (E.D.N.Y. 1998). (citing Resolution Trust Corp., 811 F. Supp. at 1014).

A motion to dismiss a complaint based on Fed. R. Civ. P. 12 (b)(6) serves to test the complaint's legal sufficiency. The legal sufficiency of Counts X and XI, in turn, must be determined pursuant to Fed. R. Civ. P. 8(a)(2) and Fed. R. Civ. P. 9(b). "The heightened pleading requirement of Rule 9(b) "generally does not apply to the state law claims of breach of fiduciary duty ..[and] aiding and abetting breach of fiduciary duty ...." In re Inacom Corp., 2001 Bankr. LEXIS 1297 at * 6 (D. Del. 2001). (citing In re Freuhauf Trailer Corp., 250 B.R. 168, 197-98 (D. Del. 2000) (footnotes

46

omitted)). Rule 9(b) is applicable to allegations of fraud and mistake only, other claims must satisfy the general pleading requirements of Fed. R. Civ. P. 8(a). See Rothman, et al. v. Specialty Care Network, Inc., 2000 U.S. Dist. LEXIS 15433 at * 6 (E.D.Pa. 2000). However, "[t]o the extent the underlying primary violations are based on fraud, the allegations of aiding and abetting liability must meet the particularity requirements of Fed. R. Civ. P. 9(b)." Kolbeck, et al. v. LIT America, Inc., et al., 939 F. Supp. 240, 245 (S.D.N.Y. 1996) (citing S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 847-48 (2d Cir. 1987)); In re Sharp Internat. Corp., 281 B.R. 506, 514 (Bankr. E.D.N.Y. 2002); In re Chief Executive Officers Clubs, Inc., 2006 Bankr. LEXIS 482 * 35 (S.D.N.Y. 2006) (citing Allied Irish Banks, P.L.C. v. Bank of Am., N.A., 2006 WL. 278138 at *11 (S.D.N.Y. 2006). ("Rule 9(b)'s particularity standards apply to a claim of aiding and abetting a fraud.")).

Count X, the Breach of Fiduciary Duty Count, alleges in part "the Insiders and Salzano derived an improper personal benefit at the expense of the company." "In addition to their regular payroll, company credit card use, and benefits, the Insiders received payment of at least $854,000.00 during the continuance of the Salzano Scheme. Compl. at ¶¶ 189-190. The Leasing Companies, it is contended, aided and abetted Debtor's insiders and are in part responsible for driving the company into insolvency, and thereafter deepening insolvency and as a result [Debtor's] "assets were dissipated." Id. at ¶ 192. Similar allegations are contained in Count XI, the aiding and abetting of a fraud claim of the Complaint. See id., ¶¶ 201-202. Since the Trustee equates the conduct of Debtor's insiders and the Leasing Companies as a fraud enabling the defendants to exploit and loot the debtor for [defendants'] own purposes, the aiding and abetting claims "allegations must be stated with particularity in accordance with Rule 9(b)." In re Monahan Ford Corp. of Flushing, 340 B.R. 1, 40- 41 (Bankr. E.D.N.Y. 2006).

As stated previously herein, "flexibility in construing the particularity requirement of Rule 9 is particularly apt when a fraud claim" is brought by the Trustee. In re Total Containment, Inc., 335 B.R. 589, 600 (Bankr. E.D.Pa. 2005) (citing Official Committee of Asbestos Claimants of G-1 Holding, Inc. v. Heyman, 277 B.R. 20, 36-37 (S.D.N.Y. 2002). However, Count XI of the Complaint alleges the participation and substantial assistance of "one or more of the Leasing Companies" without specifying the identity of "some of the Leasing Companies." Compl. ¶ 201. Rule 9(b)'s heightened pleading requirement "is to provide detailed notice of the circumstances

47

constituting fraud." Id. Clearly, an allegation that "one or more of the Leasing Companies" aided and abetted the corporate insiders' commission of a fraud without designating which Leasing Companies are the target of the cause of action violates the purpose of R.9(b). Therefore, Count XI, aiding and abetting a fraud, must be amended accordingly.

With respect to both Count X, aiding and abetting a breach of fiduciary duty, and Count XI, aiding and abetting a fraud, the Leasing Companies also raise the pleading's adequacy of the aiding and abetting elements. The Trustee's Sur-Reply attempts to summarize the Complaint's allegations regarding "knowledge, by the Leasing Companies of the violative conduct" and "the provision of substantial assistance or encouragement by the Leasing Companies." See Sur-Repl., pp.18-20. Although these factual assertions in, and by themselves, may suffice for purposes of R.9(b), the court finds these arguments further underscore the Complaint's failure to provide proper notice to each of the Leasing Companies and the imprecision by which this Complaint is presently drafted. For example, the Trustee in the Sur-Reply asserts "[a] number of the Leasing Company defendants [agreed] in violation of their usual policies, not to speak to customers." Id. at 19, (citing Compl., ¶¶ 102, 106-107).     Paragraph 102 of the Complaint references some of "some of the leasing companies" as to the complained of conduct. Therefore, the Trustee is directed within thirty (30) days of the date of this Opinion to amend Counts X and XI to inject more precision and facts to the extent such information is available, designating the specific Leasing Companies involved in the conduct and supplying the necessary factual allegations to support the aiding and abetting elements of the Trustee's claims.

### 2) Applicability of In Pari Delicto Doctrine

Apart from pursuing a dismissal of Count X and XI (and XII-deepening insolvency) based on Fed. R. Civ. P. 8(a)(2) and 9(b), the Leasing Companies also assert that dismissal is warranted due to the applicability of the in pari delicto doctrine.[24] "The doctrine of in pari delicto provides that a

---

[24] In Lafferty, the Third Circuit noted "in actions brought by the trustee as successor to the debtor's interest under section 541, the trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor . [Conversely,] the trustee is, of course, subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor." Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 356 (3d Cir. 2001) (citing Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149, 1154 (3d Cir. 1989). (accepting the legal theory of deepening insolvency under Pennsylvania law).

plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." Lafferty, 267 F.3d 340, 354 (3d Cir. 2001). (internal citations omitted). As a general proposition, "the wrongful conduct of the individual corporate officers and directors can be imputed to the corporation only if the conduct was committed 1) "in the course of [the officer or director's] employment, and (2) for the benefit of the corporation." In re Total Containment, Inc., 335 B.R. 589, 621 (Bankr. E.D. Pa. 2005) (citing Lafferty at 358-59). An exception to the imputation is the "adverse interest exception." Fraudulent conduct will not be imputed to the corporation if the officer's interest were adverse to the corporation and did not bestow a benefit upon the corporation. Lafferty, 267 F.3d at 359. (internal citation omitted). There is, however, an exception to this exception. In situations where the party who engaged in the misconduct is the sole shareholder of the corporation or functions as the "sole representative of a principal" the "sole actor" exception applies to impute the agent's fraudulent conduct to the principal's corporation regardless of whether the conduct was adverse to the principal's corporation's interest. Id.; see also In re the Personal and Business Insurance Agency, 334 F.3d at 243. (citing Lafferty at 359).

In the instant matter, the Leasing Companies seek to defeat the aiding and abetting claims by relying on the in pari delicto defense. Due to the fact that Salzano and Debtor's directors as well as officers perpetrated the fraud, their wrongdoing must be imputed to Debtor. Thus, the Trustee, in

---

"The Lafferty Court made clear that the "trustee's avoiding powers are not implicated here, as they related to the trustee's power to resist pre-bankruptcy transfers of property." In re the Personal and Business Insurance Agency, 334 F.3d 239, 245-46 (3d Cir. 2003) (quoting Lafferty, supra, at 356). As a consequence, this Court agrees with the Trustee and the moving Defendants appear to concede that the in pari delicto defense is inapplicable to Counts I, II and III as these causes of action are directly based on the Trustee's avoidance powers, 11 U.S.C. ¶¶¶ 548, 544 and 553(b).

Counts X (aiding and abetting a breach of fiduciary duty), Count XI (aiding and abetting a fraud) and Count XII (deepening insolvency) are causes of action brought pursuant to Section 541, and subject to the in pari delicto Defense. For the sake of convenience, the Court will address the affirmative defense as part of the discussion related to Counts X and XI.

turn, is barred from lodging Count X and XI against the Leasing Companies. In response, the Trustee asserts that the Adverse Interest Exception applies as Salzano acted at all times with an adverse interest toward creditors and the company, Norvergence. See Trustee Omn. Br., pp.74-75. The Leasing Companies, in reply, contend the sole actor exception invalidates the Trustee's argument that imputation is unavailable. The Trustee also argues that the in pari delicto defense cannot be applied in the absence of imputation and that for state law claims, the application of imputation is a matter of state law. O'Melveny v. Myers v. FDIC, 512 U.S. 79, 83-85; 114 S. Ct. 2048, 129 L. Ed. 2d 67 (1994). The Trustee further argues that under controlling New Jersey law, imputation is not available as a defense to bar the Trustee's claims here "because one who contributed to the misconduct cannot invoke imputation." See NCP Litigation Turst v. KPMG, LLP, 187 N.J. 353, 372, 901 A. 2d 871 (2006).

The in pari delicto doctrine is an affirmative defense that must be raised by the parties. In re Total Containment, Inc., 335 B.R. at 621. (citing Lafferty, at 354). Even though an affirmative defense is not routinely considered on a motion to dismiss, it may be entertained if it "is established on the face of the complaint." Id. (citing Leveto v. Lapina, 258 F.3d 156, 161 (3d Cir. 2001). While the parties' pleadings filed with the Court in connection with the instant motions to dismiss the Trustee's Complaint devote a significant portion to the aiding and abetting (and deepening insolvency) causes of action and the applicability of the in pari delicto defense to those claims, the applicability of the defense and the application of the imputation doctrine is not established on the face of the Complaint. Dismissal of these counts based on the In Pari Delicto defense is premature at this time. These issues are reserved for further discovery. The Court nonetheless is satisfied that Counts X and XI of the Complaint set forth claims for relief plausible on its face and not merely a formulaic recitation of the elements of a cause of action to withstand dismissal under Twombly at this time.

VI) Count XII- Deepening Insolvency

A) Count XII-Deepening Insolvency

Count XII of the Complaint asserts a deepening insolvency cause of action against the Leasing Companies. According to the Trustee, the knowledge and participation of the Leasing Companies in the Salzano Scheme as described in the Complaint permitted NorVergence's insolvency to deepen, unabated from October 2003– when the Trustee contends that most of the Leasing Companies knew or should have known about the actual fraud– through June 30, 2004, the Petition Date. See Compl., ¶ 204.    Based on the Trustee's calculations, as of June 30, 2002, NorVergence was insolvent on a balance sheet basis by $3,044,131.00, having total assets of $3,226,085.00 and total liabilities of $6,270,216.00.    One year later, the insolvency allegedly had deepened to $34,353,215.00 and on March 31, 2004, the liabilities exceeded assets by $138,201,421.00.  The continued operations of NorVergence caused an increase in its insolvency until the June 30, 2004 Petition Date. See id., ¶¶ 205-208. Pursuant to the twelfth count, the Trustee seeks to hold Salzano, the Insiders and the Leasing Companies liable for the amount by which the insolvency deepened during the said time period and collect exemplary as well as punitive damages on behalf of Debtor's estate.

### B) Movants' Perspectives

The Defendant Leasing Companies assert the deepening insolvency allegations fail for several reasons. First, there is no precedent in New Jersey for such a cause of action. As one trial court noted, "there does not appear to be any reported authority in New Jersey that validates deepening insolvency as an independent tort for which remedies are available." Citi Capital Br., pp.8-9 (citing Bondi v. Citigroup, Inc., 2005 WL 975856 at *21 (N.J. Super. L., 2005); IFC Br., pp. 16-17; Insight Br., pp. 10-11; Alfa Group Br., pp. 28-30; Popular Br., pp.36-39; USXL, pp 7-8. Citi Capital Br. at 8-9.  Second, even if deepening insolvency is recognized as an independent cause of action, the accepted formulation of deepening insolvency as a cause of action depends on there being negligent or fraudulent misrepresentation of a corporation's financial state by the defendants, resulting in the inability of the corporation's management or shareholders to properly gauge the true state of affairs and whether the business should be continued. See Citi Capital Br. at 9; Insight Br. at 10-11.  In support for this contention, Defendants argue that the Trustee has failed to provide the specifics concerning the fraud allegedly committed by the Leasing Companies. See Alpha Br., pp.

51

30-31. Here, for example, there are insufficient allegations that any of the Leasing Companies misrepresented the financial condition of the Debtor. Third, Defendants takes the view that deepening insolvency must be considered a damages theory, and not as a cause of action. The decisions of Lafferty, supra, and In re Exide Technologies, 299 B.R. 732, 751 (Bankr. D. Del. 2003), while predicting that the respective state supreme courts of Pennsylvania and Delaware would recognize such an independent cause of action, actually analyzed deepening insolvency as a harm caused to a corporate debtor rather than a cause of action with specified discrete elements. See Citi Capital Br. at 10, citing, Lafferty, 267 F 3d at 349-52; In re Exide Technologies, 299 B.R. at 751-52. Lastly, the deepening insolvency claim must be dismissed due to the affirmative defense of In Pari Delicto. Since certain of Debtor's officers, directors and insiders engaged in the fraud, their wrongs are imputed to the Debtor and the Trustee's claim, as a consequence, is barred. See Citi Capital, pp. 10-12; IFC Br., pp.17-18; Insight Br., pp.9-10; Alfa Group Br., pp. 31-33.

### C) Trustee's Opposition

In the Omnibus Brief in opposition to the motions to dismiss, the Trustee addresses several of the issues raised by the movants. The Trustee urges that the Bondi decision, an unpublished opinion, limited its discussion of the deepening insolvency theory, refraining from analyzing the viability of the cause of action due to what that court characterized as its own limited role "as a mere trial court." Trustee Omn. Resp. at 60 (citing Bondi, supra, at *21). The Trustee further asserts that Federal courts "... in the absence of an opinion of the state's highest tribunal [ ] must don the soothsayer's garb and predict how that court would rule if it were presented with the question of whether the theory of injury-deepening insolvency- is cognizable under [state] law." Id. (citing Lafferty, 267 F.3d at 349).

The Trustee asserts that under Lafferty, the soothsayer's inquiry, as performed in Lafferty consisted of two parts. First, the court examined the soundness of the theory, finding that the Pennsylvania Supreme Court would determine that deepening insolvency "may give rise to a cognizable injury." and as such "the theory is essentially sound." Id. at 61 (citing Lafferty, supra, at 349). The Trustee here argues that the New Jersey Supreme Court has recognized deepening insolvency as a cognizable injury under New Jersey law. "[W]e find that inflating a corporation's

revenues and enabling a corporation to continue in business 'past the point of insolvency' cannot be considered a benefit to the corporation." Id. (citing Lafferty, supra, at 349). NCP Litigation Trust v. KMPG, LLP., 187 N.J. 353, 381 (2006). Having a cognizable and compensable injury is the first step in the Lafferty analysis.

The final step is the determination of whether state law would allow a litigant to proceed in state court. Id. The Trustee asserts that in Lafferty, the Third Circuit relied on "one of the most venerable principles in Pennsylvania jurisprudence, and in most common law jurisdictions for that matter ... that where there is an injury, the law provides a remedy. Id. (citing Lafferty, supra, 267 F.3d at 351 (citing Hahn v. Atlantic Richfield Co., 625 F.2d 1095, 1104 (3d Cir. 1980)). Thus, the Third Circuit concluded, "where 'deepening insolvency' causes damages to corporate property, we believe that the Pennsylvania Supreme Court would provide a remedy by recognizing a cause of action for that injury." Id.

This venerable principle, according to the Trustee, is also well established under New Jersey law see, e.g., The Community Hospital Group, Inc. v. Blume Goldfaden Berkowitz Donnelly Fried & Forte, P.C., 384 N.J. Super. 251. (Super. Ct. App. Div. 2006); Walensky v. Jonathan Royce International, 264 N.J. Super 276 (App. Div. 1993);Corleto v. Shore Memorial Hospital, 138 N.J. super. 302 (Sup. Ct. 1975); Bush v. Bush, 95 N.J. Super. 368 (Sup. Ct. 1967). See Omnibus Br. at 62. When joining the venerable principle with the legally sound theory and recognized injury of deepening insolvency, a judicial soothsayer must presume the New Jersey Supreme Court would recognize a cause of action for deepening insolvency. Id.

The Trustee asserts that one case demonstrating the acceptance of deepening insolvency as a actionable injury under New Jersey law is Merin v. Yegen Holdings Corp., 240 N.J. Super. 480, 573 A. 2d 928 (App. Div. 1990). In Merin, the liquidator of a defunct insurance company, Integrity Insurance Company, sued the company's former auditors, Touche Ross & Company for "breach of contract, malpractice, negligent misrepresentation, gross negligence and recklessness, as well as fraud and aiding and abetting the misconduct of its codefendants." Id. at 487. Trustee Omn. Resp. at 65 (citing Merin, 240 N.J. Super. at 487). There, the Appellate Division concluded, the allegations were that as a result of mismanagement and fraud, the Yegen Defendants [former management] caused Integrity to become statutorily insolvent and then, with the active participation of Touche,

concealed the company's true economic condition by preparing and disseminating materially false financial statements. Id. at 488. The court, citing In re Investors Funding Corp., 523 F. Supp. 533, 541, (S.D.N.Y. 1990), noted "A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it ...Accepting the allegations of the complaint as true, it is manifest that the prolonged artificial solvency of IFC benefited only the [defendants] and their confederates, not IFC." Id. at 66 ((citing Merin, 240 N.J. Super. at 506).

### D) Movants' Response

The Moving Defendants seek the dismissal of the deepening insolvency count on the basis that the Trustee failed to allege fraudulent conduct on the part of the Leasing Companies and that fraud is an essential element of a deepening insolvency claim. Certain cases advanced by the Defendants as supporting their argument not decided under New Jersey law, including the Third Circuit's decision in Seitz v. Detweiler (In re CITX Corporation), 448 F.3d 672 (3d Cir. 2006) where the Court of Appeals reaffirmed the deepening insolvency cause of action under Pennsylvania law, and at the same time limited it to fraudulent conduct under "Lafferty's limited holding" holding that a claim of negligence cannot sustain a deepening-insolvency cause of action. Id. at 681.

The Trustee contends that moving Defendants' arguments that Count XII must be dismissed fail for several reasons. First, fraudulent conduct is alleged against the Leasing Companies in the actual intent, fraudulent conveyance and aiding and abetting fraud counts. See Compl, Counts I, II, and XI. Those allegations are expressly incorporated into the allegations of the Complaint's deepening insolvency count. See Compl., ¶ 203. Second, contrary to the claim by the moving Defendants, a formulation of deepening insolvency does not depend on there being a claim for fraud as in three separate decisions, the New Jersey Superior Court's decision in Bondi, the Appellate Division's decision in Merin and the New Jersey Supreme Court's decision in NCP, Plaintiffs were permitted to seek deepening insolvency damages on claims other than fraud. See Bondi, supra, 2005 WL 975856 at *15-25 (permitting, in addition to fraud claims, claims for negligence, misrepresentation, aiding and abetting breaches of fiduciary duty, unjust enrichment and civil conspiracy, Merin, supra, 240 N.J. Super. at 487 (permitting breach of contract, malpractice, negligence and gross negligence claims, without any fraud claim asserted. NCP, supra, 187 N.J. at

362 (permitting negligence, negligent representation, breach of contract, and breach of fiduciary duty claims, without any fraud claims asserted). Nor does it depend on the presence of a fiduciary duty or other special relationship between the parties as the decisions permitting deepening insolvency counts where defendants committed acts of fraudulent misconduct did not involve financial reporting. See Trust Omnibus Br. at 67-68 ; see alsoTrustee Br. In Opp. To USXL Motion at 5-6 citing In re CitX Corp., 448 F.3d 672 (3d Cir. 2006) (a claim of deepening insolvency requires allegations of fraudulent conduct); See also In re Exide Technologies, 299 B.R. 732, 750. (Bankr. D. De. 2006); In re Total Commitment, Inc., 335 B.R. 589, 619 (Bankr. E.D.Pa. 2005).

In response to the Trustee's Omnibus Brief, Defendant Leasing Companies revisit the Bondi case. The trial court declined to recognize the tort of deepening insolvency. On appeal, the New Jersey Supreme Court affirmed the lower court's decision. Bondi v. CitiGroup Inc., 2005 WL 975856 (N.J. Sup. L. 2005), aff'd 878 A.2d 850 (N.J. 2005).25 Therefore, the Court should not credit the Trustee's arguments and create a state law cause of action where the State's highest court has refused to acknowledge one. Alfa Reply, p. 15; Popular Reply, pp. 21-22. As for the doctrine of in pari delicto, the Trustee attempts to utilize the "adverse interest exception." This effort must fail due to the Complaint's allegation that Salzano is the sole representative of NorVergence, a principal. See Compl. at ¶ 4. As a result, Salzano's fraudulent conduct is imputable to the principal (corporation) regardless of whether the agent's conduct was adverse to the principal's (the corporation's) interests. See Alfa Reply at 15.

Defendants Leasing Companies also point to inconsistencies in the Trustee's Omnibus Brief. On the one hand, the Trustee argues the cases cited by the Defendants which interpret Pennsylvania law, such as In re CITX, are irrelevant. Yet the case the Trustee relies extensively upon the Lafferty case as a case establishing the validity of deepening insolvency under Pennsylvania law. See Popular Reply at 22 (citing Trustee Om. Br. at 61,66); IFC Reply at 11. Also, the Trustee relies on

---

25 There appears to be some confusion regarding the Bondi case citations as used by the parties. The unpublished trial court opinion, cited as Bondi v. CitiGroup, Inc., 2005 WL 975856 (N.J.Sup. 2005), was not affirmed, in contrast to what Westlaw and Defendant Alfa contend. After the trial court issued its opinion, one of the litigants sought leave to file an appeal. The New Jersey Supreme Court granted leave and remanded the case to the Appellate Division for a hearing of the appeal. See Bondi v. CitiGroup, Inc., 185 N.J. 32, 878 A. 2d 850 (N.J. 2005). The Appellate Division, in turn, entertained the appeal which solely dealt with issues of jurisdiction and forum non-conveniens. See Bondi v. CitiGroup, Inc., 2006 WL 1933319 (N.J. A.D. 2006). The trial court's statements

Merin for the proposition that New Jersey courts have permitted plaintiffs "to seek deepening insolvency damages." Popular Reply at 22 (citing Tr. Om. Br. at 67).    The Merin case, however, does not deal with claims for deepening insolvency and is therefore irrelevant. Popular Reply at 23; IFC Reply at 12. Defendant Leasing Companies also takes issue with the Trustee's reliance on NCP Litigation Trust v. KMPG, LLP., supra as "Nowhere does the [NCP Court] state or imply that the tort of deepening insolvency is recognized in New Jersey." Id. Indeed the Court never mentions the tort of deepening solvency.  IFC Reply at 12.

E) Trustee's Sur-Reply

The Trustee, in his Sur-Reply, reiterates that Lafferty prescribes the framework for the Court's determination of the viability of a deepening insolvency cause of action under any state's law.  The first step involves whether deepening insolvency gives rise "to a cognizable injury to corporate debtors." Trustee Sur-Rep. at 25 (citing Lafferty, 267 F.3d at 351). The Merin, NCP and Bondi cases, the Trustee urges, provide clear and convincing proof of the recognition under New Jersey law of deepening insolvency injuries as constituting cognizable injuries. Id. at 25-26 (citing Merin, 240 N.J. Super. at 480, 506; NCP, 187 N.J. at 381, Bondi, 2005 WL 975856 at *21-22.

After the June 14, 2007 hearing, the parties filed various post-hearing submissions; bringing to the Court's attention two decisions issued after oral argument on these motions.  Trenwick American Litigation Trust v. Billett, 931 A.2d 438 (Del. 2007); NCP Litigation Trust v. KPMG LLP, ("NCPII"), 399 N.J. Super. 606, 945 A.2d 132 (N.J. Super. Ct. 2007), and Thabault v. Chait, et al, 541 F.3d 512 (3d Cir. 2008). The Thabault v. Chait decision, according to the Trustee, affirmed the decision in the district court, specifically affirming under New Jersey law the award of $119 million in deepening insolvency damages flowing from the Commissioner's claims of negligence and malpractice. At the same time, the Trustee contends, the opinion interpreted In re CITX Corp. 448 F.3d 672 (3d Cir. 2006), as limited to Pennsylvania law, and not applicable to a determination on the availability of such damages under New Jersey law. Id.

---

regarding deepening insolvency, in other words, were never the subject of any further analysis by the Appellate Division or the New Jersey Supreme Court.

### F) Court's Findings

Count XII of the Complaint advances a deepening insolvency cause of action against all of the Defendants. Deepening insolvency, in the instant case, "is based on the fraud that enabled the defendants to 'exploit and loot the debtor for [the defendants] own purposes'...." In re Monahan Ford Corp. of Flushing, 340 B.R. 1, 40 (Bankr. E.D.N.Y. 2006). In Official Committee of Unsecured Creditors v. Lafferty & Co., Inc., 267 F.3d 340 (3d Cir. 2001), the court defined the concept of deepening insolvency as ""an injury to [a debtor's] corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life."" In re CITX Corp., Inc., 448 F.3d 672, 677 (3d Cir. 2006) (citing Lafferty, supra, at 347). The injury is premised upon the notion that "the acquisition of debt by an insolvent corporation can harm the corporation as well as its creditors by making it more difficult for the corporation to run a profitable business without resorting to bankruptcy." Alberts v. Tuft (In re Greater Southeast Community Hospital Corp.), 353 B.R. 324, 335 (Bankr. D.D.C. 2006) (paraphrasing Lafferty, supra, at 349-50). An increased debt load also forces companies to expend their resources in the repayment of debt, thereby heightening the risk of corporate dissolution through the bankruptcy process. See id.

Deepening insolvency as a legal theory is the subject of various Third Circuit case law. This case law discussing deepening insolvency grapples with the issue of whether to consider it either as an independent cause of action or as a mere theory of damages.

### A) Deepening Insolvency in Pennsylvania

In the seminal case of Lafferty, the Third Circuit Court of Appeals interpreted Pennsylvania law and recognized deepening insolvency as a cognizable independent cause of action. The Lafferty Court followed the applicable legal framework as set forth in Wiley v. State Farm Fire & Casualty Co., 995 F.2d 457, 459-60 (3d Cir. 1993). According to the Wiley framework, the Court examined 1) rulings of the Pennsylvania Supreme Court on the topic, 2) decisional law of the intermediate Pennsylvania courts, 3) federal appeals and district court cases interpreting the state law, and 4) decisions from other jurisdictions analyzing similar issues. Since neither the Pennsylvania Supreme Court nor any intermediate Pennsylvania court had addressed deepening insolvency, the Lafferty

Court donned "the soothsayer's garb and predict how that court would rule if it were presented with" the viability of a deepening insolvency claim." Id.; Lafferty, 267 F.3d at 349. After concluding that no state or federal court had analyzed Pennsylvania law on this subject, the court relied predominantly on decisions interpreting the law of other jurisdictions and on the policy underlying Pennsylvania tort law to make this prediction. The Third Circuit concluded that 1) the soundness of the theory of deepening insolvency, 2) the growing acceptance of the theory among courts, 3) and based on the remedial theme in Pennsylvania jurisprudence of the law creating a remedy where there is an injury, the Pennsylvania Supreme Court would recognize deepening insolvency as a cognizable injury. See, e.g., Lafferty, 267 F. 3d at 349-353. Since Lafferty, the Third Circuit's analysis with respect to deepening insolvency remains in effect. See, e.g., In re Total Containment, Inc., 2008 Bankr. LEXIS 681 at *32 (Bankr. E.D.Pa. 2008) ( the court on motions for summary judgment dealing in part with the tort of deepening insolvency and the in pari delicto defense noted that "the Third Circuit Court of Appeals has predicted that Pennsylvania's Supreme Court will recognize the tort of 'deepening insolvency'" and referencing Lafferty's prediction that "if faced with the issue, the Pennsylvania Supreme Court would determine that 'deepening insolvency' may give rise to a cognizable injury." (quoting Lafferty, supra, at 349)).

Even though the Lafferty case holding still stands, the Third Circuit, in In re CITX Corporation, Inc., 448 F.3d 672, 681 (3d Cir. 2006) noted that Lafferty limited the deepening insolvency claim to situations involving fraud allegations and found accusations of negligence to be inadequate to support such a claim. The Third Circuit in CITX Corp. stated "we note that Lafferty holds only that fraudulent conduct will suffice to support a deepening-insolvency claim under Pennsylvania law. We know no reason to extend the scope of deepening insolvency beyond Lafferty's limited holding. To that end, we hold that a claim of negligence cannot sustain a deepening-insolvency cause of action." In re CITX Corp., Inc., 448 F. 3d at 681. In CITX Corp. the Third Circuit rejected the use of deepening insolvency as a theory of damages, stating: "[t]he deepening of a firm's insolvency is not an independent form of corporate damage. Where an independent cause of action gives a firm a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits, then the firm may recover, without reference to the incidental impact upon the solvency calculation." Id. at 678; see also In re Total Containment, Inc., supra, 2008

Bankr. LEXIS at *31.

Recent case law has further limited the availability of deepening insolvency theory. A Pennsylvania trial court has opined that under Pennsylvania law a deepening insolvency cause of action becomes unavailing "once the ultimate harm from an unrestrained deepening insolvency has been suffered and bankruptcy has occurred." Miller v. Santilli, 2007 Phila. Ct. Com. Pl. LEXIS 252 at 13(Com. Pl. Ct. of Pa., 2007). In such a situation, traditional claims for fraud and breach of fiduciary duty, which "have been carefully shaped by generations of experience," are sufficient to recover for any wrongdoing." Id. (citing Trenwick Am. Litig. Trust v. Ernst & Young, LLP., 906 A.2d 168, 204 (Del. Ch. 2006), aff'd 931 A.2d 438 (Del. 2007)).

### B) Deepening Insolvency in Delaware

The Lafferty Court's Wiley analysis and prediction that the Pennsylvania Supreme Court would recognize a cause of action for deepening insolvency where there is fraudulent conduct based on that state's law also served as a basis for certain Delaware courts to reach a similar conclusion under Delaware law. Utilizing the Wiley framework, the court in In re Exide Technologies, Inc. et al, 299 B.R. 732, 752 (Bankr. D.Del. 2003) predicted in 2003 that the Delaware Supreme Court would also recognize a claim for deepening insolvency when there has been damage to corporate property. After determining the highest state court and the intermediate courts in Delaware had not spoken on the deepening insolvency tort, the Exide Court consulted case law in the Third Circuit. Id. at 751. Taking guidance from Lafferty and the soundness of the theory, growing acceptance of the theory among courts and the remedial theme of in Pennsylvania law, Exide concluded that Delaware adheres to the same principle as Pennsylvania. Id. at 752. Therefore, based on Lafferty "and the Delaware courts' policy of providing a remedy for an injury," the court concluded "that the Delaware Supreme Court would recognize a claim for deepening insolvency when there has been damage to corporate property." Id.

The Exide Court's analysis and its prediction that the Delaware Supreme Court would recognize a deepening insolvency cause of action was shared a few years later by OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.), 340 B.R. 510, 530-31 (Bankr. D.Del. 2006).

The viability of a deepening insolvency tort claim under Delaware law came to an end,

however, when the Delaware Supreme Court rejected the <u>Lafferty</u> Court's prediction. In <u>Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.</u>, 931 A.2d 438 (Del. 2007), the Delaware Supreme Court affirmed the Delaware Court of Chancery in its disapproval of the deepening insolvency cause of action.

The Delaware Court of Chancery confronted a motion to dismiss a multi-claim action filed by a litigation trust against former Trenwick America directors and advisors. <u>Trenwick Am. Litig. Trust v. Ernst & Young, LLP.</u>, 906 A.2d 168, 2006 Del. Ch. LEXIS 139 (Del. 2006), <u>aff'd</u> <u>Trenwick Am. Litig. Trust v. Billet</u>, 2007 Del. LEXIS 357 (Del. 2007). One of the claims concerned a deepening insolvency cause of action brought against the former Trenwick America directors. The lower court began its critique of the deepening insolvency theory by addressing cases from the Third Circuit which viewed the claim favorably. According to the trial court, "[t]he concept of deepening insolvency has been discussed at length in federal jurisprudence, perhaps because the term has the kind of stentorious academic ring that tends to dull the mind to the concept's ultimate emptiness." The court pointed to the <u>Lafferty</u>, <u>In re Oakwood Homes Corp.</u> and <u>In re Exide Technologies, Inc.</u> cases as instances whereby federal courts "became [so]infatuated with the concept [of deepening insolvency], that they "did not look closely enough at the object of their ardor." <u>Trenwick</u>, 906 A.2d at 206. None of these decisions produced a workable definition of deepening insolvency and none "explains the rationale for concluding that deepening insolvency should be recognized as a cause of action or how such recognition would be consistent with traditional concepts of fiduciary responsibility." <u>Id.</u> at 206-07. "In fact, many of the decisions that seem to embrace the concept of deepening insolvency do not clarify whether the concept is a stand-alone cause of action or a measurement of damages (the extent of deepening) for other causes of action." <u>Id.</u> at 207.

Furthermore, in addition to the failure to render a workable deepening insolvency theory and the inadequate analysis of the cause of action by the aforementioned cases, the <u>Trenwick</u> lower court also considered a growing body of federal jurisprudence taking a critical view towards the deepening insolvency theory as a factor compelling it to dismiss the deepening insolvency claim.[26]

---

[26] Examples of these cases rejecting the deepening insolvency cause of action include <u>Bondi v. Bank of America Corp. (In re Parmalat)</u>, 383 F. Sup. 2d 587 (S.D.N.Y. 2005); <u>Alberts v. Tuft (In re Greater Southeast. Community Hosp. Corp.)</u>, 333 B.R. 506 (Bankr. D.C. 2005) and <u>In re Vartec Telecom, Inc.</u>, 335 B.R. 631 (Bankr. N.D. Tex. 2005). <u>See</u> <u>Trenwick</u>, 906 A.2d 168, 207, n.105.

Another reason mandating the rejection of deepening insolvency as an independent cause of action under Delaware law was in the Court's view the absence of a real need for such a cause of action. A plaintiff raising allegations that resemble a deepening insolvency is remitted

> to the contents of their traditional toolkit, which contains, among other things, causes of action for breach of fiduciary duty and for fraud. The contours of these causes of action have been carefully shaped by generations of experience, in order to balance the societal interests in protecting investors and creditors against exploitation by directors and in providing directors with sufficient insulation so that they can seek to create wealth through the good faith pursuit of business strategies that involve a risk of failure.

Id. at 205.

Following the Trenwick decision by the Delaware Supreme Court, federal courts in Delaware have dispensed with the deepening insolvency as a valid cause of action or as a theory of damages. In In re Troll Communications, LLC., et al, 385 B.R. 110, 122 (Bankr. D. Del. 2008) the court dismissed part of a complaint "in relation to the request for relief based upon the theory of deepening insolvency both as a valid cause of action, relying on Trenwick, and as a theory of damages relying on CITX Corp." A similar result was reached in In re the Brown Schools, 386 B.R. 37, 44 (Bankr. D. Del. 2008), where the court dismissed a count of a complaint for deepening insolvency after citing Trenwick and noting that "Delaware does not recognize a cause of action for deepening insolvency."

### C) Deepening Insolvency in New Jersey

In light of the rejection of deepening insolvency as an independent cause of action and arguably theory of damages under Delaware law on one hand with the Lafferty opinion permitting a deepening insolvency claim under Pennsylvania law, as modified by subsequent Third Circuit cases, on the other, the issue to be determined is the viability of deepening insolvency as a cause of action under New Jersey law.

The Trustee as well as the moving Defendants rely on the above mentioned cases to present their respective view involving the viability of deepening insolvency as a cause of action based on the law of this state. In Bondi v. Citigroup, Inc., et al., 2005 WL 975856 (N.J. Super. 2005), a New Jersey trial court noted that at that time there did not appear to exist "any reported authority in New Jersey that validates deepening insolvency as an independent tort for which remedies are available".

61

Id. at *21.  This Court, as federal trial court, is not aware of any recent New Jersey case law filling this void and as a result must analyze the Trustee's deepening insolvency claim in accordance to the Wiley framework, set forth in Lafferty.

> 1) New Jersey Supreme Court's View on Deepening Insolvency, Decisional Law of New Jersey Intermediate Courts and Federal Appeals and District Court cases interpreting New Jersey Law.

The first three prongs of the Wiley analysis deals with New Jersey Supreme Court cases, Intermediate state court decisions and federal appeals and district court cases evaluating the existence of a deepening insolvency claim under New Jersey law. In Thabault v. Chait, 541 F.3d 512 (3d Cir. 2008), the Third Circuit affirmed the District Court jury's award of approximately $183 million in damages and prejudgment interest to the receiver of Ambassador Insurance Company. On appeal, the auditor of the insurer, Price Waterhouse Coopers, LLP., jointly and severally liable on the judgment, argued the case was improperly based on a theory of damages for deepening insolvency and that such a theory cannot be used as a measure of damages for an independent cause of action such as malpractice. The Third Circuit determined to leave the award in place as it concluded that the damages presented to the jury were based on traditional New Jersey tort damages. Id. at 518-519.

As part of the Third Circuit's analysis of the auditor's argument, the court observed "[a]lthough neither the New Jersey legislature nor the New Jersey Supreme Court has authorized a "deepening insolvency" cause of action, ..., there has been a trend among the state's courts toward recognizing "deepening insolvency" damages." Id. at 521.  The appeals court continued by discussing NCP Litig. Trust v. KMPG, LLP ("NCP I"), 187 N.J. 353, 901 A.2d 871 (N.J. 2006) and NCP. Litig. Trust v .KMPG, LLP. ("NCP II"), 399 N.J. Super. 606, 945 A.2d 132 (N.J. Super. Ct. 2007). In NCP I, the New Jersey Supreme Court addressed the question of "damages resulting from the inflation of a company's revenues and continuation beyond insolvency" in the face of an assertion of the in pari delicto defense. Thabault, 541 F.3d at 521-522. On appeal, the Supreme Court of New Jersey affirmed the lower court's determination that because KPMG's alleged negligence contributed to the misconduct of officers at Physician Computer Network, Inc. ("PCN"), KMPG was barred from raising the in pari delicto defense. According to the court, "inflating a

corporation's revenues and enabling a corporation to continue in business' past the point of insolvency' cannot be considered a benefit to the corporation." Id. at 522 (citing NCP I at 888).

The Third Circuit in Thabault "addressed the question of whether New Jersey jurisprudence recognized deepening insolvency as a theory of harm to the corporation." Id. (citing NCP II at 140). The Third Circuit in Thabault went on to note: "In NCP II, the court rejected our language in City and embraced the theory that corporate damage could be found in the form of increased liabilities, decrease in fair asset value and lost profits, noting that such damage encompasses the same concept as deepening insolvency. Relying on the Supreme Court's statement in NCP I, the trial court held:

> Whether courts term it 'deepening insolvency' or describe in detail the gamut of destruction that the term is meant to embrace, the bottom line is the same. Harm is harm. Where there is harm, the law provides a remedy . . . The artificial prolongation of an insolvent corporation's life can harm a corporation. Where there is harm, the law provides a remedy.

Id. at 522 (citing NCP II at 144).

As rationale for this conclusion, the trial court stated its agreement with the court in In re Greater Se. Community Hosp. Corp., 353 B.R. 337, which stated "that deepening insolvency is a form of corporate damage, and was always meant to be such." NCP II at 144. Moreover, the NCP II court pointed to NCP I case where the State Supreme Court, indicated that "much like the court in Schacht, [711 F.2d 1343, 1348 (7th Cir.), cert. den. 464 U.S. 1002 (1983)], the artificial prolongation of an insolvent corporation's life can harm a corporation. Where there is a harm, the law provides a remedy." NCP II at 144.

Based on the decision of the New Jersey Supreme Court in NCP I and the lower court in NCP II, the Third Circuit in Thabault opined:

> In light of NCP I and NCP II, we are not as resolute that New Jersey law would not recognize deepening insolvency as a cause of action or as a theory of damages. In the end, we are satisfied that New Jersey law provides for a remedy for traditional tort damages that flow from wrongful conduct that results in increased liabilities, decrease in fair asset value and lost profits of a corporation.

Thabault, 541 F.3d at 522-23.

In utilization of the Wiley framework as illustrated in Lafferty, this Court finds that the New Jersey Supreme Court and intermediate courts have not definitely ruled regarding deepening

insolvency as an independent tort under New Jersey law. The most recent federal case with respect to a claim of deepening insolvency under New Jersey law, the Third Circuit opinion in Thabault, supra, declined to take a position and instead left the issue for the New Jersey Supreme Court. The Third Circuit in Thabault and the New Jersey Supreme Court in NCP II both make clear that New Jersey jurisprudence accepts the venerable principle of the law providing a remedy where there is a harm or injury. Therefore, this Court, predicting "how the [Supreme Court of New Jersey] would rule on the deepening insolvency claim if such claim was presented" as a cause of action, must conclude that this state's highest court would recognize a claim for deepening insolvency when there has been harm or damage to the corporate debtor." In re Exide Technologies, 299 B.R. 751-752.

This Court having found that the New Jersey Supreme Court would recognize deepening insolvency as a cause of action, it must now proceed to evaluating Court XII under Fed. R. Civ. P. 12(b)6. A case could be made that the Trustee's "deepening insolvency claim is based on the fraud that enabled the defendants to "exploit and loot the debtor for [the defendants'] own purposes," and therefore" the deepening insolvency cause of action is to be pleaded with particularity pursuant to Fed. R. Civ. P. 9(b). In re Monahan Ford Corp. of Flushing, 340 B.R. 1, 40, (Bankr. E.D.N.Y. 2006). (citing Kolbeck v. LIT America, Inc., 939 F.Supp. 240, 245 (S.D.N.Y. 1996).) Regardless of whether R. 9(b) or R. 8(a) (2) is to be applied, each of the provisions aims to provide adequate notice to the defendants involved. In the instant case, the Complaint alleges only that "most of the leasing companies knew or should have known about the actual fraud." Compl. ¶ 204. Since Count XII is silent as to the precise Leasing Company Defendants charged with knowledge of the stated alleged fraud, the adequate notice requirements are violated. Therefore, the Trustee is directed to, within thirty (30) days of the date of this Opinion, amend Count XII accordingly to state these fraud allegations with particularity in accordance with Rule 9(b). The Court is satisfied, nonetheless, that Count XII of the Complaint sets forth claims for relief plausible on its face and not merely a formulaic recitation of the elements of a cause of action to withstand dismissal under Twombly at this time.

**VII) Complaint's Confusion as to Identity of Defendant IFC and Insight & Insight's Improper Receipt of Summons.**

Apart from arguing the merits of the Complaint, Defendant Insight also seeks a dismissal of the Complaint due to the Trustee's confusion regarding the identity of Insight and due to the Trustee's service of processes in violation of Fed. R. Bankr. P. 7004(b)(3). The caption of the Complaint lists as Defendant "IFC LEASING, INC. A/K/A IFC CREDIT CORPORATION A/K/A INSIGHT FINANCIAL CORP." See Insight Br. at, Ex. D.

The Complaint itself describes the Defendant as

> "IFC Leasing, Inc. a/k/a IFC Credit Corporation a/k/a Insight Financial Corp. ('IFC') is a corporation which purchased Leases from NorVergence with a place of business at 2121 Pennsylvania Avenue, NW, Washington, DC 20433."

Compl., ¶29.

Insight asserts that Insight is not and has never been an alias of IFC Credit and that Defendant IFC and Insight are two separate and distinct companies, maintaining their own unrelated websites. Copies of Illinois State Corporation File Detail Reports demonstrate the two entities are separate entities, each with their own independent principal place of business in the State of Illinois. IFC Credit Corporation is an Illinois Corporation, whose principal is Rudolph D. Trebels located at 8700 Waukegan Road #100, Morton Grove IL 60053. Insight, in contrast, is a Delaware corporation whose principal is Paul E. Watkins, with a principal place of business at 707 Skokie Boulevard, Suite 600, Northbrook, IL 60062. Insight's former place of business was 1935 Shermer Road, Suite 300, Northbrook IL 60062. See id. at 6; see also Ex. A (Decl. of Margaret M. Bauer), B, C, and E (Decl. of Brian H. Meldrum).

Another reason for the dismissal of the Complaint against Insight concerns the Trustee's attempted service of the Summons and Complaint pursuant to Fed. R. Bankr. P. 7004(b)(3). This provision requires that service by first class mail on a domestic corporation be addressed to "the attention of an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service." Here, the Trustee mailed service of the Summons to the attention of "Insight Financial Corp." 1935 Shermer Road, Suite 300, Northbrook IL 60062-5254" without directing the Summons to an officer or authorized agent. See id. Ex. D. Since the Rules mandate a strict adherence to the language of B.R. 7004(b)(3), see, e.g., In re Schoon, 153 B.R. 48, 49 (Bankr. N.D. Cal. 1993), Insight urges that the Court must dismiss the Complaint for insufficiency of process.

A third ground upon which the Complaint must be dismissed, Insight asserts, is the absence of any allegations against Insight in the Complaint. Nowhere does the Trustee list Insight as a recipient of payments from the Debtor or provide any specifics as to how Insight was involved with the "Salzano Scheme." Insight argues that "Apart from the Trustee's mistaken association of Insight with IFC Credit, the Complaint does not allege that Insight has done anything actionable or received any money from the Debtor." Insight Br. at 2. Given this fact, a dismissal pursuant to Fed. R. Civ. P. 12 (b)(6) is proper.

The Trustee concedes the "a/k/a" was mistakenly employed in the caption of the Complaint. Nevertheless, the naming of Insight as a defendant in the Complaint was intentional and appropriate. The Trustee asserts in his brief that "[b]etween January 24, 2003 and June 14, 2004 Insight received a total of $521,077.16 of payments from the Debtor, a vast majority of which constituted return of funds from the Debtor and/or First Payment Defaults as described in ¶¶ 106-122 of the Complaint. Trustee Omn. Resp. at 29. Due to this error, "[t]he Trustee is preparing an Amended Complaint as to Insight and, with leave of court, will serve that Amended Complaint on Insight following the hearing on these motions." Id. at 30.

With respect to the violation of B.R. 7004(b)(3), the Trustee also concedes he failed to direct the service to an appropriate officer or agent. Insight argues for strict compliance with the Rule, but such strict compliance with the letter of the statute contradicts both the spirit and letter of the Bankruptcy Rules. See, e.g., Fed. R. Bankr. P. 9005, Fed. R. Civ. Proc. 61; Jahan, Co. v. Dakota Industries, Inc., 27 B.R. 575, 580-581 (D.N.J. 1983). Fed. R. Civ. P. 4(m) states the general rule that effective service is to be made within 120 days of the Complaint's filing. In the event no timely, or proper service is effectuated, the court must dismiss the complaint without prejudice against that defendant or direct service be effectuated within a specific time. For good cause shown the Court must extend the time for service for an appropriate period. Rule 4(m). Thus, in the absence of good cause, the court may extend time for service in its discretion. Petrucelli v. Bohringer and Ratizinger, GMBH, 46 F.3d 1298, 1305 (3d Cir. 1995). The Trustee urges that even if service was technically deficient, the Complaint should not be dismissed as to Insight because the avoidance claims alone, aggregating over $500,000.00 as to Insight, would be lost due to the passage of the statute of limitations on such claims." Trustee Onmibus Br. at 34.

66

In its Reply Brief, Insight reiterates the position that Insight was not merely mistakenly alleged to be an alias of IFC, but the Complaint levels no allegations against Insight whatsoever. Insight also repeats its arguments favoring a strict interpretation of B. Rule 7004(b)(3). Insight Repl. Br. at 2.

An additional ground advanced in favor of the dismissal of the complaint against Insight is the lapse of the two year statute of limitations set forth in 11 U.S.C. § 546 and the requirement that any amendment to a complaint adding avoidance claims under 11 U.S.C. § 544 and 548 must satisfy F. R. Civ. P. 15(c)(1)(B) in order to relate back to the date of the original complaint to survive the statute of limitations. Insight argues that an amendment of the Complaint to add specific claims against Insight violates the two year statute of limitation set forth in 11 U.S.C. ¶ 546. See id., pp. 3-4. Any Chapter 5 claim not filed with the Complaint became time barred the day after the commencement of the adversary proceeding. Seven months after filing the Complaint, the Trustee seeks to amend the Complaint to add new transfers involving Insight. Fed .R. Civ. P. 15(c) requires that any avoidance claims must relate back to the filing of the Complaint to survive the statute of limitations. Here, Insight argues, the original Complaint contained no allegations against Insight and did not put Insight on notice of any claims lodged against it. Based on this, any newly added avoidance claims or transfers pertaining to Insight cannot relate back and cannot satisfy R. 15(c)(1)(B). See id., pp. 4-5.

In his Sur-Reply, the Trustee rebuts Insight's contention based on Rule 15(c)2. First, the amended claim arises out of the same conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading. See id. Also, although Insight relies on R.15(c)2, the Trustee asserts that the situation here is specifically covered by R. 15(c)(3) which sets forth the prerequisites to permit "relation back" in the case of a misnamed defendant. See id. at 28. The initial Complaint, according to the Trustee, did level allegations at Insight. It alleged at least $521,002.16 in fraudulent transfers as to Insight and included Insight in Count III, sounding in set-off under §553(b). See id. at 29. The mistake in the original Complaint was not a failure to raise the fraudulent transactions and other transfers; rather, it was the combining of Insight's $521,002.16 in transfers with IFC's $50,662.53 in transfers, and the Trustee seeking recovery of at least $571,739.69 in Counts I and II against an improperly combined Insight and IFC. See id. (citing Compl. ¶¶ 112, 122, 129. The

Trustee does note that in the Amended Complaint he seeks to add one additional transfer to Insight in the amount of $75.00 for a total claim for direct transfers of $521,077.16 and set-offs of $708,444.86 against Insight in Counts One, Two and Three. Id. at 29, n. 16. Since the contours of the conduct, transactions or occurrences set forth in the original Complaint are the same as those to be placed at the center of the Amended Complaint, there is relation back and the Amended Complaint is not futile for the purposes of R. 15(c).

The Trustee notes that critical in the analysis of whether relation back exists is the notice requirement. See id. at 30 (citing Johnson v. Goldstein, 850 F. Supp. 327, 329 (E.D. Pa. 1994)). Thus, the Court must look to see if service was made within 120 days, as prescribed by Rule 4(m), so that the party to be brought in has received such notice of the action and will not be prejudiced. Here service was made on Insight within the 120 day period. The original Complaint placed Insight on notice of the pending causes of action. Also, Insight has been active in the case through counsel since it received a copy of the Complaint and has not alleged any prejudice to it. The Trustee concedes that he failed to address the envelope containing the complaint and summons to a specific officer or agent of Insight, which, he urges, is a technical violation of Bankruptcy Rule 7004(b)(3). Trustee Sur-Repl. at 33. The Trustee requests that the Court consider the provisions of Fed. R. Bankr. P. 9005, making Fed. R. Civ. Pro. 61 ("Harmless Error") applicable to bankruptcy cases, which provides that "when appropriate, the court may order the correction of any error or defect or cure of any omission that does not affect substantial rights."

Rule 9005 embodies the language of former Rule of Bankr P. 704(4) which provided that errors "in the papers served or the manner or proof of service" could be overlooked by the court "if no material prejudice resulted therefrom to the substantial rights of the party against whom the process issued." The Trustee argues that the proposed amendment of the Complaint does not prejudice Insight and, thus, the Trustee should be permitted to correct the pleading errors found in the Complaint. Id. at 35-36.

In the event the Court finds R. 7004(b)(3) must be strictly applied, the Trustee requests the Court use its discretion under Fed. R. Civ. P. 4(m) and grant the Trustee an extension of time to re-serve the Complaint. The running of the statute of limitations is a factor supporting the discretionary granting of an extension of time to make service under Rule 4(m). Id. at 25 (citing Boley v.

Kaymark, 123 F.3d 756, 759 (3d Cir. 1997)).

After reviewing the parties' positions and the cited case law in support, the Court finds the reasons advanced in favor of a dismissal of the Complaint against Insight due to defective service of process unpersuasive. Fed .R. Bankr. P. 7004(b)(3) governs service by first class mail and states in relevant part:

> upon a domestic or foreign corporation or upon a partnership or other unincorporated association, by mailing a copy of the summons and complaint to the attention of an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process.

Counsel for the Trustee concedes this Rule was not followed when the summons and copy of the Complaint were mailed without any of Insight's officers or authorized agents being designated as a recipient.

Essentially, the Court is called upon to determine the remedy for the Trustee's failure to adhere to B.R. 7004(b)(3). Insight advocates for the dismissal of the Complaint pursuant to Fed. R. Civ. P. 12(b)(4) and/or (5) while the Trustee posits the Court should invoke Fed. R. Bankr P. 9005 to excuse the technical error and/or Fed. R. Civ. P. 4(m) to extend the time for service, allowing the Trustee to re-serve the Complaint. Fed. R. Bankr. P. 9005 makes applicable to bankruptcy cases the harmless error principles of Fed. R. Civ. Pro. 61 and provides that "When appropriate, the court may order the correction of any error or defect or the cure of any omission which does not affect substantial rights." Rule 61, in turn, provides

> Unless justice requires otherwise, no error in admitting or excluding evidence - or any other error by the court or a party - is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding any parties' substantial rights must disregard all errors or defects that do not affect any parties substantial rights.

In In re Lease-A-Fleet, Inc., 1995 U.S. Dist. LEXIS 18607 (E.D.Pa. 1995), on appeal of an order dismissing a Chapter 11 case, the district court excused the bankruptcy court's failure to comply with the notice provisions of Fed. R. Bankr. P. 2002(a)(5) after the court determined the decision of the bankruptcy court to shorten the period of time for notice of the United States Trustee's Motion to convert or Dismiss the debtor's Chapter 11 case to constitute harmless error. Id. at *8. Even though

Debtors/ appellants claimed to be prejudiced by the bankruptcy court's action, the district court relied on Rule 9005 and the harmless error principles of Rule 61 when it noted "[a]bsent any showing as to the negative impact of [Judge Scholl's] shortened timetable, any claimed error must be deemed harmless...." Id. at *8 (citing In re Mandalay Shores Co-op. Hous. Ass'n., 63 Bankr. 842, 852 (N.D. Ill. 1986).

Rule 61 made applicable to bankruptcy proceedings by B.R. 9005 offers a basis upon which the Court could excuse the Trustee's failure to abide by the provisions of R. 7004(b)(3). Here, Insight has not made a showing of how it was prejudiced by the deficient service of the summons and Complaint. To the contrary, Insight has fully participated through counsel as a party in this adversary proceeding from the time the Trustee mailed Insight the Complaint and Summons in October of 2006.[27]

Rule 4(m), as made applicable to the instant adversary proceeding by Fed. R. Bankr. P. 7004 (a) provides in pertinent part:

> Time Limit for Service. If a defendant is not served within 120 days after the complaint is filed, the court- on motion or on its own after notice to the plaintiff- must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period. . . .

In the leading case of Petrucelli v. Bohringer and Ratzinger, 46 F.3d 1298 (3d Cir. 1995), the Third Circuit interpreted Rule 4(m) after the 1993 revision. The Third Circuit found the Advisory Committee notes on the Rule 4(m) amendment instructive. The Committee explained :

> "The new subdivision provides that the court shall allow additional time if there is good cause for the plaintiff's failure to effect service in the prescribed 120 days, and authorizes the court to relieve a plaintiff of the consequences of an application of this subdivision even if there is no good cause shown." Id.

Based on these comments, the Pertucelli Court held that a court entertaining a motion to

---

27 The Trustee cites to Jahan Co. v. Dakota Industries, Inc., 27 B.R. 575 (D.N.J. 1983) and certain other cases in support for the proposition that (former) Bankruptcy Rule 704(h) permits a court excusing errors regarding service of process so long as the manner or proof of service did not cause material prejudice to the substantial rights of the party against whom the process issued. Since the language in Rule 704 is no longer part of the Fed. Rule of Bankr. P. and cannot be found in B.R. 7004 and notwithstanding similar language generally is found in B.R. 9005, the Court need not rely on cases interpreting (former) Rule 704(h) to support its decision.

extend time for service must first

> "determine whether good cause exists for an extension of time. If good cause is present, the []court must extend time for service and the inquiry is ended. If, however, good cause does not exist, the court may in its discretion decide whether to dismiss the case without prejudice or extend time for service.

Id. at 1306.   Only after the reviewing court has conducted an analysis of good cause and arrived at the conclusion that no good cause exists, may it consider whether the running of the statute of limitations would necessitate a discretionary extension of time. Id.

A "good cause determination depends upon two principal factors." Goodstein v. Bombardier Capital, Inc., 167 F.R.D. 662, 666 (D. Vt. 1996). "First, it must be considered whether the plaintiff has made a reasonable effort to effect service and, second, to what degree, if any, the defendant has been prejudiced but the failure to effectuate proper service." Id. (quoting Gordon v. Hunt, 116 F.R.D. 313, 320 (S.D.N.Y.), aff'd 835 F.2d 452 (2d Cir. 1987), cert. den., 486 U.S. 1008, 108 S.Ct. 1734 (1988)).   In Goodstein, the court found that the plaintiffs had not undertaken a reasonable effort to effect service and determined good cause was lacking when plaintiffs, within the 120 day time frame, failed to attempt to correct service after they learned their initial attempt to be defective. Id.   Nevertheless, the Goodstein Court exercised its discretionary authority to deny defendant's motion to dismiss when it noted the defendant had actual notice of the case almost since its inception and had actively participated in the case so that there was no prejudice by the failure to serve. Id. at 667. The court's decision to deny the dismissal was also guided by the fact that the relevant statute of limitations had expired, "thereby justifying relief on the ground that the action would otherwise be time-bared." Id. at 667. (citing Bd. of Trustees of Trucking Employees v. Canny, 876 F. Supp. 14, 16 (N.D.N.Y. 1995).

In the case before this Court, the Trustee's failure to ensure adequate service of process by not complying with Rule 7004(b)(3) must be regarded as an error. In addition, the fact that the Trustee did not correct the error within the 120 day time frame could be a factor precluding a finding of good cause. However, like the defendant in Goodstein, Insight has been an active participant in this adversary proceeding from almost its inception, and has actively participated in this case. Furthermore, Insight has not demonstrated how it has been prejudiced by the Trustee's failure to properly effect service of the Complaint. Due to the expiration of the two year statute of limitations

contained in § 546 for action under §§ 548 and 544 of the Bankruptcy Code, the dismissal of the
Complaint would constitute a harsh remedy.  Accordingly, the Court will utilize its discretion and
order the Trustee to effectuate proper service upon Defendant Insight within thirty (30) days of the
date of this Opinion.

As far as the application of R.15(c) is concerned, the dismissal of the Complaint as to Insight
is inappropriate.  The applicable version of R. 15(c)(1), made applicable to bankruptcy proceedings
by Fed. R. Bankr. Pro. 7015, provides that:

> An amendment to a pleading relates back to the date of the original pleading when
> (1) relation back is permitted by the law that provides the statute of limitations
> applicable to the action, or
> (2) the claim or defense asserted in the amended pleading arose out of the conduct,
> transaction, or occurrence set forth or attempted to be set forth in the original
> pleading, or
> (3) the amendment changes the party or the naming of the party against whom a
> claim is asserted if the foregoing provision (2) is satisfied and, within the period
> provided by Rule 4 (m) for service of the summons and complaint, the party to be
> brought in by amendment (A) has received such notice of the institution of the action
> that the party will not be prejudiced in maintaining a defense on the merits, and (B)
> knew or should have known that, but for a mistake concerning the identity of the
> proper party, the action would have been brought against the party. (Norton, 2005-
> 06).

As a general matter, "[r]ule 15(a) declares that leave to amend "shall be freely given when
justice so requires"; this mandate is to be heeded."  Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct.
227, 9 L. Ed. 2d 22 (1962). "Rule 15(c) is "to be liberally construed, particularly where an
amendment does not allege a new cause of action but merely ... make[s] defective allegations more
definite and precise."" Coan v. O.G. Industries, Inc. (In re Austin Driveway Services, Inc.), 179 B.R.
390, 395 (Bankr. D. Ct. 1995) (citing Siegal v. Converters Transp. Inc., 714 F.2d 213, 216 (2d Cir.
1983)). "The most important factor in determining whether to allow an amended complaint to relate
back to the date of the original filing is whether the original complaint provided the defendant with
sufficient notice of what must be defended against in the amended pleading." Brandt v .Gerardo (In
re Gerardo Leasing, Inc.), 173 B.R. 379, 388 (Bankr. N.D. Ill. 1994) (citing In re Barnes, 96 Bankr.
833, 836 (Bankr. N.D. Ill. 1989)).

The proposed amendments to correct the name of Insight and the alleged transaction amounts

in this Court's view do meet the criteria to "relate back" to the date of the original Complaint. No new or additional legal theories are introduced and the same alleged conduct, transactions or occurrences are relied upon as set forth in the original Complaint. The amendments will make these allegations more precise as against Insight. Also, as the Trustee correctly contends, Insight was named in the Complaint's caption. The error here was the identification of Insight as an alias of IFC. The fact that Insight has fully participated in the instant proceeding since almost its inception illustrates that Insight received such notice of the action that it will not be prejudiced in defending the Complaint on its merits. As a result, the proposed amendments to the Complaint to correct the errors outlined here and to add one additional transfer comport with Rule 15 and will be deemed to relate back to the filing of the original Complaint such that the amendments are not futile. The Trustee may file and serve such Amended Complaint as against Insight within thirty (30) days of the date of this Opinion.

### VIII) Applicability of Fed. R. Civ. P. 12(e)

Defendant Popular also petitions this Court to compel the Trustee to provide a more definite statement pursuant to Fed. R. Civ. P. 12 (e) as an alternative remedy to dismissal of the Complaint based on R. 12(b)(6). Fed. R. Civ. P. 12(e) made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7012(b), allows a party to move for a more definite statement, if "a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response."

Generally, "[t]he law disfavors Rule 12(e) motions. Resolution Trust Corp. v. Gibson, 829 F. Supp. 1095, 1103 (E.D. Mo. 1993) (citing Thrasher v. Missouri State Highway Comm'n, 534 F. Supp. 103, 106 (E.D. Mo. 1981), aff'd 691 F. 2d 504 (8th Cir. 1982), cert. denied 460 U.S. 1043, 75 L. Ed. 2d 797, 103 S. Ct. 1440 (1983)); see also FRA S. P.A. v. Surg-O-Flex of America, Inc., 415 F. Supp. 421, 427 (S.D.N.Y. 1976). Rule 12(e) motions are generally limited to remedying unintelligible, rather than insufficiently detailed, pleadings. Briley v. City of Trenton, 164 F.R.D. 26, 30 (D.N.J. 1995) (citing Resolution Trust Corp., 829 F. Supp. at 1103.).

The Court will grant Popular's motion for a more definite statement of claims asserted by the moving Defendants herein, including Popular. Even though the pleadings cannot be regarded as

unintelligible they do, as presently drafted, lack precision and particularity in violation of Fed. R.
Civ. P. 8 and 9 as outlined in this Opinion. The Trustee is directed to amend the Complaint within
thirty (30) days of the date of this Opinion to include information contained in the Trustee's
pleadings and Responses to these motions and, to the extent additional documents and information
has become available and the Trustee is capable of pleading with greater specificity, amend the
Complaint accordingly.

### (IX) Insight Financial Corp.'s Motion for a Dismissal of the Scuttaro Cross-Claim.

Apart from petitioning the Court for a dismissal of the Trustee's Adversary Complaint,
Movant Insight also moves for dismissal of Defendant Arthur Scuttaro's Cross-Claim.[28] In
response to the Trustee's commencement of this Adversary Proceeding, Scuttaro, a former officer
and insider with Debtor, filed an Answer as well as a Cross-Claim on September 8, 2006. See
Scuttaro Answer, Docket Rep., #24. The Cross-Claim for Indemnification and Contribution is
asserted against Debtor and all Defendants for any liability Scuttaro may face as a result of the
Trustee's legal action. See id. at 29-30. Scuttaro, as Pro Se, sets forth his Cross-Claim for
Indemnification and Contribution as follows: "Defendant, Arthur S. Scuttaro, hereby asserts
cross claims and demands judgment against Debtor, Norvergence, Inc. and all defendants for
indemnification and contribution of Defendant, Arthur S. Scuttaro, for any liability which he may
incur as a result of the claims set forth, together with attorney's fees and costs of suit."

---

[28]In addition to Insight, various other Defendants have previously filed motions to dismiss
the Scuttaro Cross-Claim. On November 6, 2007, the Court entered orders granting the motions
filed by General Electric Capital Corporation, on behalf it itself and as successor-in-interest to
Defendant ABB Business Finance; IFC and Popular, the latter as joined by First Lease, Inc.,
BB&T Leasing Corp., and R-G Crown Bank Leasing. See Docket Rep., ## 113, 114 and 115.

Insight asserts that Fed. R. Civ. P. 12 (b) (6) also applies to the Cross-Claim. Since the Cross-Claim is comprised of one single legal conclusion, devoid of any specific facts supporting his right to indemnification or contribution from Insight, Scuttaro has failed to state a claim upon which relief can be granted. Thus, a dismissal thereof is appropriate based on Fed. R. Civ. P. 12(b)(6). See Insight Br. at 13.

While a complaint [or cross-claim] attacked by a Rule 12 (b)(6) motion to dismiss does not need to contain detailed factual allegations, the rule does require a plaintiff to provide "the 'grounds' of his 'entitlement to relief'" Showalter v. Brubaker, 283 Fed. Appx. 33, 35 (3d Cir. 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007)) This "'requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not [suffice].'" Id. (quoting Twombly, supra, at 1965)). Any "'[f]actual allegations must be enough to raise a right to relief above the speculative level.'" Kasher v. Wesner, 2008 U.S. Dist. LEXIS 62874 at * 9 (E.D. Pa. 2008) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1964-1965, 167 L. Ed. 2d 929 (2007)).

Evaluating Scuttaro's Cross-Claim with the applicable standard, the Court finds the Cross-Claim to fall short in several respects. First, as Movant correctly argues, the Cross-Claim consists of a single sentence. No facts are offered in an effort to support the requested relief and no grounds demonstrating Scuttaro's entitlement to indemnity and contribution can be ascertained. In other words, the Cross-Claim amounts to nothing more than a mere conclusion. Pursuant to Twombly, Scuttaro's Cross-Claim must be dismissed with prejudice.[29]

### (X) Conclusion

Defendant IFC's Motion For Leave to File Supplemental Legal Authority is GRANTED.

Defendants Citi Capital, IFC, First Lease, Insight, Alfa Group, Popular and USXL's motions to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) are DENIED IN PART; and

---

[29]The same result will also follow when Fed .R. Civ. P. 8(a) is invoked. Rule 8(a) "requires that a complaint [or cross-claim] include "a short and plain statement of the claim showing that the plaintiff is entitled to relief." Hudson v. McKeesport, et al., 244 Fed. Appx. 519, 521 (3d Cir. 2007). Scuttaro's conclusory pled Cross-Claim does not attempt to make any such showing.

GRANTED IN PART.  Count IX of the Complaint shall be Dismissed with prejudice.   Popular's

Motion for a more definite statement pursuant to Fed. R. Civ. P. 12(e) is GRANTED as to all

moving Defendants.

Defendant Insight's Motion to Dismiss the Complaint based upon the Trustee's failure to

effect proper service of the Summons and Complaint is DENIED and the Trustee is granted thirty

(30) days from the date of this Opinion to file and serve an Amended Complaint.

The Trustee is directed to file and serve an Amended Complaint in compliance with this

Opinion within thirty (30) days from the date of this Opinion.

Defendant Insight's Motion to Dismiss Defendant Arthur Scuttaro's Cross-Claim for

Indemnification and Contribution is GRANTED.

An order shall be submitted in accordance with this Opinion.

Dated:  May 13, 2009

ROSEMARY GAMBARDELLA
UNITED STATES BANKRUPTCY JUDGE